James VANDERWEYST, et al.,
Petitioners, Appellants,

v.

FIRST STATE BANK OF
BENSON, Respondent.

Patrick J. WALSH, et al.,
Petitioners, Appellants,

v.

STATE BANK OF PENNOCK,
Respondent.

Charles HEIMARK, Jr.,
Petitioner, Appellant,

v.

NORWEST BANK
MONTEVIDEO, Respondent.

Joseph J. BANDAS, et al.,
Petitioners, Appellants,

v.

CITIZENS STATE BANK OF SILVER
LAKE, et al., Petitioners,
Respondents.

Nos. C4–87–283, C5–87–339, C6–87–379
and C7–87–1184.

Supreme Court of Minnesota.

June 3, 1988.

As Amended July 5, 1988.

Scott B. Lundquist, Michael D. Miller, Minneapolis, for appellants in all four cases.

John W. Riches, II, Benson, and Peter B. Stein, Stein & Moore, P.A., St. Paul, for First State Bank of Benson C4–87–283.

Donald M. Spilseth, Willmar, for State Bank of Pennock C5–87–339.

Jerry W. Snider, Calvin L. Litsey, Minneapolis, David Minge, Montevideo, for Norwest Bank of Montevideo C6–87–379.

Reed H. Glawe, Gary W. Koch, New Ulm, for Citizens State Bank of Silver Lake C7–87–1184.

## OPINION

SIMONETT, Justice.

The issues in these four appeals are whether federally-insured, state-chartered banks have preemptive most favored lender status under federal law, and, if so, whether under state law their agricultural loans charged a permissible interest rate and were otherwise lawful. We answer these issues, for the most part, yes, but remand in one case on a particular fact issue.

Minn.Stat. § 334.011 (1986) regulates the interest rate chargeable on agricultural loans under $100,000 and states any lender may charge not more than 4½ percent in excess of the applicable federal discount rate. In each instance involved here, the bank charged more. The banks contend, however, that Minnesota law, when read in light of federal legislation regulating interest rates for state-chartered, federally-insured banks, authorized them to charge interest at a rate up to 21.75 percent on agricultural loans. All the loans were made between 1983 and 1985, and, with the possible exception of one loan to appellant Joseph Bandas, all the loans were financed at an interest rate lower than 21.75 percent (in a range from 11.85 percent to 16 percent).

The banks say they may charge the higher rate because they have "most favored lender" status under 1980 federal legislation entitled the Depository Institutions Deregulation and Monetary Control Act of 1980, Pub.L. No. 96–221, 94 Stat. 132, 161 (codified in scattered sections of 12 and 15 U.S.C.) (hereafter the Deregulation Act).

They claim that the most favored lender doctrine authorizes them to charge the highest interest rate allowed under Minnesota law to any lender empowered to make agricultural loans. They argue that state law authorizes industrial loan and thrift companies to make agricultural loans at an interest rate up to 21.75 percent per annum and, therefore, that they may do the same.

Plaintiff-appellant borrowers contest the banks' position each step of the way. They deny the Deregulation Act gives the banks most favored lender status. They deny that state law allows industrial loan and thrift companies to charge 21.75 percent on agricultural loans. Finally, even if the banks could use the 21.75 percent rate, plaintiffs claim the banks failed to comply with other material provisions regulating loans made by industrial loan and thrift companies. In short, plaintiffs claim the bank loans are in violation of Minnesota's usury laws. In addition, in one case it is claimed that the bank charged 51.52 percent interest on a particular loan in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO).

In *First Bank East v. Bobeldyk*, 391 N.W.2d 17 (Minn.App.1986), the court of appeals held that the Deregulation Act extended most favored lender status to federally-insured state banks. We denied the borrower's petition for further review in that case. Since then, the issue has continued to fester in cases before the court of appeals and it appears this is a matter of statewide importance that should be considered by this court.[1] Consequently, we have granted the borrowers' petitions for further review in the cases now before us, all of which have followed *Bobeldyk*, namely, *VanderWeyst v. First State Bank of Benson*, 408 N.W.2d 208 (Minn.App.1987) (wherein we also granted oral argument); *Walsh v. First State Bank of Pennock* (and *Heimark v. Norwest Bank Montevideo*), 409 N.W.2d 5 (Minn.App.1987), and

*Bandas v. Citizens State Bank of Silver Lake*, 412 N.W.2d 818 (Minn.App.1987). We now consolidate these cases on appeal, and this opinion covers all four cases.

Specifically, the appellate court in these appeals has held: That the Deregulation Act permits extension of the most favored lender doctrine to insured state banks; that under this doctrine the banks may charge interest on their agricultural loans at the rate allowed industrial loan and thrift companies; and that banks, to qualify for most favored lender status, need not adhere to the licensing, lending, and loan splitting and ceiling provisions required for industrial loan and thrifts. Finally, in *Bandas*, while the court ruled that one of the loans was made at a usurious rate, it further held that this did not constitute a RICO violation. Each of these holdings is put at issue in these appeals.

## I.

We hold the Deregulation Act gives respondent banks "most favored lender" status. 12 U.S.C. § 1831d(a) (1982) of the Act, dealing with federally-insured, state banks, says:

> In order to prevent discrimination against State-chartered insured banks, * * * with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank * * * would be permitted to charge in the absence of this subsection, such State bank * * * may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, * * * charge on any loan * * * interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper * * * *or at the rate allowed by the laws of the State*, territory, or district where the bank is located, whichever may be greater. [Emphasis added]

1. Apparently no appellate courts of other states have dealt with the question. In *Attorney General of Maryland v. Equitable Trust Co.*, 294 Md. 385, 390–91, 450 A.2d 1273, 1278 (1982), the trial court held that the Deregulation Act extended most favored lender status to state-insured banks, but this ruling was not challenged on appeal.

Thus one of the preemptive alternatives given insured state banks is to charge "the rate allowed by the laws of the State." Because state laws, as in Minnesota, provide for different rates for different institutions for different classes of loans, the question arises what is meant by "rate allowed"? The banks contend this phrase means that they may charge interest at the highest rate available to any competing lender under the state law; in other words, that they are entitled to most favored lender status. Plaintiffs argue this meaning is not to be read into the statutory language, particularly when the legislative history of the Act is silent on the most favored lender doctrine.

The banks point out, however, that the "rate allowed" language is the same wording that appears in the 1864 National Bank Act, where the clause has been construed to give national banks most favored lender status, *i.e.*, to give national banks the same interest rate privileges as any competing state institution. For this well-established construction, *see Tiffany v. National Bank of Missouri*, 85 U.S. (18 Wall.) 409, 412, 21 L.Ed 862 (1873); Office of the Comptroller of the Currency, 2 *Comptroller's Interpretative Rulings: Changes in Text, 1948–77*, §§ 7310, 9510 (1963); 12 C.F.R. § 7.7310(a) (1988); *see also, e.g., Marquette National Bank of Minneapolis v. First of Omaha Service Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978); *Fischer v. First National Bank of Omaha*, 548 F.2d 255 (8th Cir.1977).

Did Congress, in enacting the Deregulation Act, intend to give federally-insured, state-chartered banks the same favorable status it had given national banks? In a matter of this importance, involving the law of usury and the need for certainty in business transactions, one would expect Congress to have spoken plainly. Instead, inexplicably, the Act uses language inviting uncertainty and disagreement. *See, e.g.,* Arnold and Rohner, *The "Most Favored Lender" Doctrine for Federally Insured Financial Institutions—What Are Its Boundaries?* 31 Cath.U.L.Rev. 1 (1981); Comment, *Extension of the Most Favored Lender Doctrine Under Federal Usury Law: A Contrary View,* 27 Vill.L.Rev. 1077 (1981–82). Perhaps this confusion is not surprising because usury law, whether federal or state, has become so arcane and impenetrable (as commentators frequently observe) that one yearns to start over with a clean slate. In any event, the Federal Deposit Insurance Corporation, the Federal Home Loan Bank Board, and the National Credit Union Administration have all issued interpretative opinions construing the Deregulation Act to give insured state banks most favored lender status. So has the Minnesota Commissioner of Banks (Interpretation, March 5, 1981).

We conclude that the "rate allowed" clause should be construed as granting to federally-insured, state-chartered banks most favored lender status. We are persuaded that by using the same "rate allowed" language in the Deregulation Act that appears in the National Bank Act, Congress intended to give this status to state insured banks.[2] Furthermore, what is clear, both from the Congressional

---

**2.** Section 85 of the National Bank Act (12 U.S.C. § 85), after providing that national banks may charge "the rate allowed by the laws of the State," or at the floating discount rate, which may be even greater, goes on to say, "except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter."

This "exception clause" does not appear in the Deregulation Act, and plaintiffs argue that its absence means that Congress did not intend to incorporate the most favored lender doctrine

into the Deregulation Act. We disagree. From the beginning, the courts have relied on the "rate allowed" clause as the source of most favored lender status for national banks. *See Northway Lanes v. Hackley Union National Bank & Trust Co.,* 464 F.2d 855, 862–63 (6th Cir.1972) (quoting *Tiffany* ). The "except" clause, it seems to us, means that if "a different rate is limited," *i.e.,* if state law provides a higher rate limited only to state banks, that rate, too, is available to the national bank.

It would seem the "except" clause was omitted from the Deregulation Act because it was not needed. The Deregulation Act's purpose was to

Record and from the Act itself, is Congress' desire to put insured state banks on an equal footing with their national competitors. Because national banks enjoy "most-favored lender" status, insured state banks are placed on an equal footing only if they, too, are afforded the same status.

But in any event, argue plaintiffs, the Deregulation Act does not extend most favored lender treatment to agricultural loans. They observe that the Public Law version of the Act addresses business and agricultural loans under Title V, Part B. *See* 94 Stat. at 164. But the "rate allowed" language is found not in Part B, but in Part C, which addresses "Other Loans." *Id.* at 164–68. Further, it appears that only Part C, and not Part B, was directed to be codified at 12 U.S.C. § 1831d. We are not persuaded. Part B, we note, has a 3–year sunset provision. Parts B and C, we think, are not mutually exclusive but more cumulative in effect, and the codified text at § 1831d, which is the same as in the statute at large, makes no distinction between classes of loans but applies to "any" loan. *Cf. In re Lawson Square, Inc.,* 816 F.2d 1236, 1239 (8th Cir.1987) (Parts A and C not mutually exclusive).

## II

■ The next issue is what is the highest interest rate under Minnesota law that the respondent banks with most favored lender status may charge on agricultural loans? We answer 21.75 percent.

### A.

Admittedly, the banks may charge the floating 4½ percent over federal discount rate on agricultural loans. Minn.Stat. § 334.011 says so:

Notwithstanding the provisions of any law to the contrary a person may, in the case of a contract for the loan or forbearance of money * * * in an amount of less than $100,000 for business or agricultural purposes, charge interest at a rate of not more than 4½ percent in excess of the discount rate on 90 day commercial paper in effect at the Federal Reserve bank * * *.

*See also* § 48.195 (1986) ("Notwithstanding any law to the contrary," a depository institution may charge not more than 4½ percent over the federal discount rate on "any loan").

Under the most favored lender doctrine, however, an insured state bank (like a national bank) may also charge the higher rate of interest allowed under state law to any competing state-licensed or chartered lending institution for the same specified class of loans. *See* 12 C.F.R. § 7.7310(a) (1988). The competing lending institution ordinarily need not be the same type of lender; it may be "any" lender, such as here an industrial loan and thrift. But the interest rate sought to be used must be for the same class of loan, here an agricultural loan.

While plaintiffs argue industrial loan and thrifts were intended to make consumer loans, nothing in Chapter 53 limits these lenders to loans for particular purposes, and they would have the right to make agricultural loans. Whether, in fact, they are actually making agricultural loans is not the test; it is enough for the most favored lender doctrine that the lender has the right to make these loans. *See Fischer,* 548 F.2d at 257.

As authority to charge 21.75 percent, the banks cite the fourth sentence of § 53.04, subd. 3a(a), which gives industrial loan and thrifts "[t]he right to extend credit or lend money and to collect and receive charges therefor as provided by chapter 334, *or in lieu thereof* to charge, collect, and receive interest at the rate of 21.75 percent per annum * * *." (Emphasis added.)

The "in lieu" language is awkward. Observe, however, that the 21.75 percent rate

---

put insured state banks on a parity with national banks, and to do this it was unnecessary to say—as the "except" clause in this context would then say—that state banks can charge what state law says they can charge.

is in lieu of all rates permitted under Chapter 334. Observe also the quoted sentence gives both the right to lend money and the right to charge interest "as provided by chapter 334," but that the "in lieu" clause refers only to the right to charge interest. We construe the sentence to mean that industrial thrifts may make Chapter 334 loans and charge interest as provided in Chapter 334, but in lieu of the interest allowed by Chapter 334 on these loans, 21.75 percent interest may be charged.

This construction appears to conflict, however, with § 334.011 which says that "[n]otwithstanding the provisions of any law to the contrary;" a person (i.e., any lender) may charge interest of "not more" than the floating rate on business and agricultural loans.[3] This language may be read one of two ways. Either it means that the floating rate for agricultural loans is the exclusive rate that may be charged on agricultural loans; or it means that the floating rate is permitted for agricultural loans even though other provisions of the law provide for contrary rates. The respondent banks urge the second interpretation. We incline towards the second interpretation, but even if the first interpretation is adopted to create a conflict between sections 334.011 and 53.04, it appears that the 21.75 percent rate prevails.

If two statutes are in irreconcilable conflict, the special provision shall prevail over the general, unless the general provision was enacted at a later session and the legislative intent is manifest that the general provision shall prevail. See Minn.Stat. § 645.26 (1986). Here, within the context of interest rates for agricultural loans, it appears that § 334.011 is the provision dealing specially with agricultural loans and § 53.04 deals with loans generally. It also appears, however, that § 334.011 was enacted in 1976 and last amended in 1981, while § 53.04, subd. 3a(a) was enacted in 1981 and amended in each of the four succeeding years. See Dahl v. Lanesboro State Bank, 399 N.W.2d 621, 623 (Minn. App.1987). We conclude, therefore, that § 53.04, subd. 3, being later in time and exhibiting a manifest intent to prevail over § 334.011, should be deemed to be controlling. In other words, we hold that the floating rate under § 334.011 is not an exclusive rate for agricultural loans for all lenders under state law, but 21.75 percent is available for agricultural loans made by industrial loan and thrifts and, hence, also to insured state banks with most favored lender status.

### B.

One more step remains in our analysis. Respondent banks may use the industrial thrifts' 21.75 percent rate *for the same specified class of loans.* In the cases before us, the class consists of loans for agricultural purposes. But is the class further limited? The class may also be defined by the amount of the loan,[4] and the specific question that arises here is wheth-

---

3. Prior to 1981, § 334.011 began with the clause "Notwithstanding the provisions of section 334.-01 [the general 8 percent rate] or other law to the contrary * * *." At the 1981 session, 5 days after the 21.75 percent "in lieu thereof" language was added to § 53.04, the "notwithstanding" clause was amended by deleting the reference to § 334.01 to state, "Notwithstanding the provisions of any law to the contrary * * *." Plaintiffs would read into this amendment a legislative intent for § 334.011 to override the 21.75 percent alternative added to § 53.04. The amendment of the "notwithstanding" clause strikes us as a simple housekeeping amendment and nothing more.

4. See OCC Interpretative Letter No. 178, 5 Consumer Cred.Guide (CCH) ¶ 97,239 (1981), where the Comptroller says a bank borrowing at a small loan rate is bound by the small loan law limitations on the total amount of the loan.

One must distinguish between the amount of the loan which determines the class and a loan amount provision which materially affects determination of the interest rate. See Part III, infra. An example of the latter instance might be where the amount of an individual loan is affected by the method of computing unpaid balances for open-end credit transactions. Plaintiffs fail to make this distinction, arguing in their briefs that the $35,000 loan limit is a provision "materially" affecting determination of the interest rate. The $35,000 ceiling does not affect the interest rate. The loan amount has nothing to do with how much interest a

er the $35,000 loan limit prescribed by the Minnesota Regulated Loan Act is a class determinant. If thrifts cannot make loans of more than $35,000 at 21.75 percent interest, then neither can the banks. The banks are entitled to parity with the most favored lender, not a leg up.

Respondent banks argue there is no $35,000 ceiling for thrifts making a Chapter 53 loan, but if there is, the ceiling defines a class of lender, not a class of loans. The loan ceiling is not in Chapter 53 but is found in § 56.131, subd. 1(a) (1984), a part of the Regulated Loan Act, and provides:

> On any loan in the principal amount of $35,000 or less, a licensee may contract for and receive interest, * * * not exceeding the equivalent of the greater of * * *
>
> (1) the total of: [different rates for balances under and over $350]; or
>
> (2) 21.75 percent per year * * *.

If the respondent banks were making loans under Chapter 56, the above-quoted ceiling would, we think, be a class limitation.[5] But the banks' loans were made under Chapter 53. Section 53.04, subd. 3a(a)[6] gives an industrial loan and thrift three alternatives: (1) under the first three sentences, to make loans "under chapter 56"; (2) under the fourth sentence, to make

loans "as provided by chapter 334"; and (3), also under the fourth sentence, to make Chapter 334 loans at 21.75 percent interest. Here, if the loans had been made under the first option, it would appear that the $35,000 ceiling required by the Regulated Loan Act would be a determinant of the class of loans, which is what plaintiffs urge. Respondent banks, however, made their loans under a claim of most favored lender status, and this status entitles the banks, nothing appearing to the contrary, to treat their loans as made under Chapter 53. This being so, the $35,000 loan limit of Chapter 56 is not involved and does not define the class. Rather, these loans are deemed to be Chapter 53 loans, and there is no loan limit in Chapter 53.[7] Consequently, the class of loans involved here, for the purpose of the most favored lender doctrine, is defined only by the type of loan, namely, as loans for agricultural purposes.

### III.

Even though the interest rate charged by the respondent banks was permissible, are the loans nevertheless usurious because the banks failed to comply with other regulations applicable to loans made by industrial loan and thrifts?

The "rate allowed" language in the National Bank Act has been construed

---

thrift can charge on a loan, but whether it can make the loan at all.

**5.** The 1985 legislature amended § 56.131, subd. 1(a) (1984), to read: "On any loan in a principal amount not exceeding $35,000 *or ten percent of a corporate licensee's contributed capital and appropriated reserves as defined in section 53.015, if greater,* a licensee may" charge either the stepped-up rate or 21.75 percent. 1985 Minn. Laws 1st Sp.Sess., ch. 1, § 19. After the effective date of the amendment, the $35,000 amount no longer serves to define the class of loans because the alternative loan ceiling, dependent on each lender's capital and reserves, eliminates the flat amount, across-the-board, determinant. The loans involved in these appeals were made prior to the amendment.

**6.** Minn.Stat. § 53.04, subd. 3a(a) (1984), reads:
> The right to make loans, secured or unsecured, at the rates and on the terms and other conditions permitted licensees under chapter

56. Loans made under the authority of section 56.125 must be in amounts in compliance with section 53.05, clause (7). All other loans made under the authority of chapter 56 must be in amounts in compliance with section 53.05, clause (7), or 56.131, subdivision 1, paragraph (a), whichever is less. The right to extend credit or lend money and to collect and receive charges therefor as provided by chapter 334, or in lieu thereof to charge, collect, and receive interest at the rate of 21.75 percent per annum.

**7.** Section 53.05, subd. 7 (1984), prohibits an industrial loan and thrift from "lend[ing] money in excess of ten percent of its contributed capital and appropriated reserves to a person primarily liable." This is not a class determinant. The lending limit varies with each lender depending on that lender's capital and reserves and, therefore, serves only to regulate each individual lender. *Cf.* footnote 5, *supra.*

to mean that the most favored lender doctrine adopts the state's usury laws "only insofar as they severally fix the rate of interest." *Evans v. National Bank of Savannah*, 251 U.S. 108, 111, 40 S.Ct. 58, 59, 64 L.Ed. 171 (1919). The bank is subject, however, to those provisions of state usury law that are "material to the determination of the interest rate." *See* 12 C.F.R. § 7.7310 (1988). While there is some difference of opinion as to the test of materiality, *see Attorney General of Maryland v. The Equitable Trust Co.*, 294 Md. 385, 450 A.2d 1273 (Md.App.1982), we believe as a general proposition, that a provision is material to a determination of the interest rate if it (1) pertains to the manner in which the numerical rate of interest is calculated, or (2) defines the class of loans in such a way (as by size, type of borrower, or maturity) as to affect the borrowed interest rate. *See* 12 C.F.R. § 7.7310 (1988); *Partain v. First National Bank of Montgomery*, 467 F.2d 167, 173 n. 5 (5th Cir.1972). Thus, licensing requirements for an industrial loan and thrift are not material to a determination of the 21.75 percent rate and, therefore, banks with most favored lender status need not comply with those requirements when they use the 21.75 percent rate. 12 C.F.R. § 7.7310 (1988). In our appeals, plaintiffs do not claim other-

wise but they do claim the respondent banks were required to comply with certain provisions governing loan splitting and the charging of attorney fees.[8] Both the trial courts and the court of appeals disagreed, holding these provisions were not material. We, too, find the regulatory provisions inapplicable, but we do so without reaching the question of their materiality to the interest rate.

The prohibitions against loan splitting and charging attorney fees in case of default appear in Chapter 56.[9] Apparently, industrial thrifts make mostly "regulated loans" under Chapter 56 and would, of course, be subject to the regulatory provisions of that chapter on those loans.[10] But, as we have seen (Part II), industrial thrifts may also make Chapter 53 loans, *i.e.*, loans under the third alternative of § 53.04, subd. 3a(a), and there are no prohibitions against loan splitting or charging attorney fees in Chapter 53. While § 56.002 says that industrial thrifts shall comply, except for licensure, with all other provisions of Chapter 56, the section then perversely adds "when contracting for or receiving charges on loans regulated by this chapter." As noted, the loans here were not made under Chapter 56. We need not consider changes in the law made after these loans.[11] It is enough to say that the regu-

---

**8.** Plaintiffs also claim the $35,000 loan ceiling in § 56.131, subd. 1 (1982), is a provision material to determination of the interest rate. As we have previously noted, this provision, if relevant, is relevant only to a determination of class of loan, not as affecting the interest rate. *See* footnote 4, *supra.*

**9.** Loan splitting under § 56.131, subd. 3 (1984), is defined as dividing a loan into more than one loan "for the purpose or with the result of obtaining a higher rate of charge than would otherwise be permitted by this section." Such a practice would be material to a determination of the interest rate. But even if the section were applicable here, there has been no showing that any loans were split, much less any showing that any split resulted in a higher interest rate than 21.75 percent.

**10.** *See* R. Fuller and J. Kost, *Usury, Interest and the Minnesota Business,* Minn. CLE Manual 14 (April 1984). At pages 23–24, the authors list the four kinds of credit that are extended to industrial loan and thrifts under § 53.04.

**11.** Section 53.04, subd. 3a(a), it will be recalled, gave loan and thrifts the right to make loans and charge interest as provided by Chapter 334 and, "in lieu thereof" to charge 21.75 percent interest a year. To this loan-making right the 1985 legislature added " * * * including the right to contract for, charge, and collect all other charges including discount points, fees, late payment charges, and insurance premiums on the loans to the same extent permitted on loans made under the authority of chapter 56, regardless of the amount of the loan." 1985 Minn.Laws 1st Sp.Sess., ch. 1, § 12, effective June 25, 1985. See also the amendment to § 53.04 adding subdivision 4a requiring documentation of loans made pursuant to the section. 1985 Minn.Laws 1st Sp.Sess., ch. 13, § 188, effective Jan. 1, 1986.

Because of the complexity involved, it is no wonder the 1985 legislature amended § 53.04 to require thrifts to disclose on their notes "the provisions of Minnesota Statutes under which the rate of interest and other charges are autho-

latory provisions of Chapter 56 do not apply to the loans by respondent banks.

We hold, therefore, that the loan splitting and attorney fees provisions of Chapter 56 do not apply to the loans involved in these cases.

## IV.

The *Bandas* appeal raises two additional issues. The respondent bank made an agricultural loan to Joseph and Marjorie Bandas in the amount of $36,000 represented by a note dated November 30, 1984, for 2 weeks, with a stated interest rate of 14.25 percent. Accompanying the loan was a truth-in-lending statement listing an "origination fee" of $540 and an actual interest rate of 51.52 percent.

Two issues are presented: (1) Does the "origination fee" constitute interest so as to make the loan's annualized interest rate 51.52 percent, a clearly usurious rate? (2) If so, is the usurious transaction a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)? The trial court answered the first question no and did not reach the second question. The court of appeals reversed on the first issue, finding a usurious interest rate, but, on the second issue, held that RICO does not apply because one transaction does not constitute a "pattern" of unlawful conduct. *Bandas v. Citizens State Bank of Silver Lake*, 412 N.W.2d 818, 821 (Minn.App.1987).

## A.

The court of appeals relied on a Chapter 56 definition of interest, citing § 56.001, subd. 5 (1986), which broadly defines interest as "all charges payable directly or indirectly by a borrower * * * as an incident to the loan, however denominated * * *."[12] Under this definition, according to the court of appeals, the "origination fee" was

"incident to the loan" and, therefore, includable in the interest rate calculation.

The appellate panel apparently thought the Chapter 56 definition of interest governed because § 53.04, subd. 3a(a) (1986) provides that the Chapter 53 lender may "collect all other charges including discount points, *fees*, late payment charges, and insurance premiums on the loans *to the same extent permitted on loans made under the authority of chapter 56 * * *.*" (Emphasis added.) But this quoted language was a 1985 amendment to § 53.04, subd. 3a. It was not in the statute at the time the Bandas loan was made in November 1984. Consequently, it appears that the Chapter 56 definition of interest does not govern.

In the absence of any applicable statutory provision defining what should be included as interest for a Chapter 53 loan made in 1984, we believe the common law applies. This court has long followed the general rule that reasonable expenses incurred by the lender in preparing a loan may be charged to the borrower without making the loan usurious. *See, e.g., Kroll v. Windsor*, 259 Minn. 200, 201, 107 N.W. 2d 53, 55 (1960); *Hatcher v. Union Trust Co. of Maryland*, 174 Minn. 241, 244, 219 N.W. 76, 77–78 (1928); *Lassman v. Jacobson*, 125 Minn. 218, 219–20, 146 N.W. 350, 351 (1914). Here the $540 origination fee (the equivalent of 1.5 points) would not be considered as interest if it was compensation for expenses incurred in preparing the loan and its security. On the other hand, if the fee is not related to any separate expenses but is compensation for the use of the money loaned, it would be considered as interest. On motions for summary judgment, the trial court found that the origination fee was for services rendered, but there is nothing in the record to support this finding other than an affidavit of a

---

rized." 1985 Minn.Laws 1st Sp.Sess., ch. 13, § 188.

**12.** Section 56.001, subd. 5 goes on, however, to say that interest "shall not include permissible default or deferment charges, lawful fees for

any security taken, insurance charges or premiums, court costs, or other charges specifically authorized by law." *See also* § 56.131, subd. 2 (1986), which places limitations on additional charges that may be made.

bank officer simply making that assertion. We have, therefore, an unresolved fact issue which must be remanded to the trial court for further proceedings.

## B.

If the Bandas loan should be found to be usurious on remand, would that transaction be a RICO violation? We decline to rule definitively because of an unresolved jurisdictional question.

The court of appeals held that a single unlawful debt, *i.e.*, a loan twice the lawful interest rate, did not constitute a pattern of racketeering activity, as a "pattern" requires at least two unlawful acts. *Bandas*, at 821. We doubt the applicability of this reasoning. Under RICO the unlawful conduct is "through a pattern of racketeering activity *or* collection of unlawful debt." 18 U.S.C. § 1962(c) (1982) (emphasis added). In other words, it appears that a pattern of racketeering activity and the collection of unlawful debt are separate RICO violations. The Act defines "unlawful debt," and the definition requires, among other things, the usurious debt to have been incurred in connection with "the business of lending money" at a usurious rate "where the usurious rate is at least twice the enforceable rate." *Id.* § 1961(6); *Durante Bros. and Sons, Inc. v. Flushing National Bank*, 755 F.2d 239, 249 (2d Cir.1985), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654. The Act seems to be directed at loan sharking. In any event, there is no allegation or showing that the Citizens State Bank was engaged in the business of making usurious loans at double the lawful rate. If we were to rule, we would rule there is no RICO violation because there is no "collection of unlawful debt."

There is, however, a serious, threshold jurisdictional issue not raised by the parties. For a RICO violation, a person injured "may sue therefor in any appropriate United States district court." 18 U.S.C. § 1964(c) (1982). There is a sharp split of authority, in both state and federal courts, on whether federal courts have exclusive

jurisdiction over RICO claims or whether state courts have concurrent jurisdiction. For exclusive jurisdiction, *see, e.g., Main Rusk Associates v. Interior Space Constructors, Inc.*, 699 S.W.2d 305 (Tex.App. 1985); and *County of Cook v. Midcon Corp.*, 574 F.Supp. 902 (N.D.Ill.1983), *affirmed* 773 F.2d 892. For concurrent jurisdiction, *see, e.g., Rice v. Janovich*, 109 Wash.2d 48, 742 P.2d 1230 (1987), and *Lou v. Belzberg*, 834 F.2d 730 (9th Cir.1987), *cert. denied* — U.S. —, 108 S.Ct. 1302, 99 L.Ed.2d 512. We have serious reservations about our courts assuming concurrent RICO jurisdiction. The parties have not, however, raised the issue, much less briefed it, and without the question receiving the considered attention it deserves, we decline to decide the issue at this time.

Affirmed in all cases, except, in *Bandas*, the case is remanded for further proceedings as indicated.

WAHL, J., dissents in part.

POPOVICH, J., took no part in the consideration or decision of this case.

WAHL, Justice, concurring in part, dissenting in part.

Though I concur, for the most part, with the majority opinion, I must respectfully dissent from that portion which holds that state banks, having most favored lender status, may charge up to 21.75 percent a year on their agricultural loans made between 1983 and 1985. The legislature made manifest its intent, in Minn.Stat. § 334.011, subd. 1, that the maximum interest rate to be established for an agricultural loan was not more than 4½ percent in excess of the federal discount rate, "[n]otwithstanding the provisions of any law to the contrary." "Notwithstanding the provisions of any law to the contrary" —these are strong words, words that were unrepealed and unmodified when the legislature extended to industrial loan and thrift companies the right "to collect and receive charges [for the credit extended or money loaned therefor] as provided by chapter

334, or in lieu thereof to charge, collect and receive interest at the rate of 21.75 percent per annum." Minn.Stat. § 53.04, subd. 3a(a).

The foremost rule of construction given us by the legislature regarding the resolution of apparently conflicting provisions in the Minnesota Statutes is that "[w]hen a general provision in a law is in conflict with a special provision in the same or another law, the two shall be construed, if possible, so that effect may be given to both." Minn.Stat. § 645.26, subd. 1 (1986). We must first attempt to reconcile the two statutes, giving effect to both, before proceeding to determine which provision prevails. Reconciliation can be effected in this case by construing the provision of § 53.04, subd. 3a(a) that industrial loan and thrift companies may make loans with interest up to certain rates ceilings "as provided by chapter 334, or in lieu thereof * * * at the rate of 21.75 percent" to mean that industrial loan and thrift companies may generally charge up to 21.75 percent interest, unless chapter 334 specifies a different rate on particular types of loans being made.

This construction would avoid conflict because only one provision would apply to a particular loan being made. The bank's proposed construction of section 53.04, on the other hand, would greatly circumscribe the ambit of section 334.011 because no federal bank or federally insured state bank would be governed by the interest rate ceiling specified in either chapter 334 or in chapter 48. Since virtually every bank and savings and loan organization in Minnesota is federally insured, only a handful of private lenders would be governed by the interest rate in section 334.011. It is unlikely the legislature intended section 53.04 to so circumscribe the reach of section 334.011's prescription of an interest rate ceiling of agricultural and business loans. It is more reasonable to construe section 53.04 to require compliance with the rate ceiling in section 334.011 on agricultural loans and to set a 21.75 percent

rate ceiling for other loans. The highest rate state banks, having most favored lender status, could charge on their agricultural loans would be that prescribed by section 334.011, not more than 4½ percent in excess of the federal discount rate. I would so hold.