668 A.2d 1067

JAMES H. HUNTER, ON BEHALF OF HIMSELF AND ALL OTH-
ERS SIMILARLY SITUATED, PLAINTIFF–APPELLANT, v.
GREENWOOD TRUST COMPANY, DEFENDANT–RESPON-
DENT.

Argued February 15, 1995—Decided November 28, 1995.

*Alan S. Kaplinsky, Burt M. Rublin,* Philadelphia, Pa., for Greenwood Trust Co.

*Michael D. Donovan,* a member of the Pennsylvania bar, argued the cause for appellant (*Spector Gadon & Rosen,* attorneys; *Mr. Donovan* and *Ann Miller,* a member of the Pennsylvania bar, of counsel; *Mr. Donovan, Ms. Miller, Paul R. Rosen* and *Robert L. Grundlock, Jr.,* on the briefs).

*Arthur R. Miller,* a member of the Massachusetts bar, argued the cause for respondent (*Archer & Greiner,* attorneys; *Mr. Miller* and *Sean T. O'Meara,* on the briefs).

*Marilyn A. Bair,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*James J. Ciancia,* Acting Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

*Richard P. Jacobson* submitted a brief on behalf of *amici curiae* The States of Arizona, Delaware, Louisiana, Nevada, Ohio, South Dakota, and Utah (*Dunn, Pashman, Sponzilli, Swick & Finnerty,* attorneys).

*Charles N. Riley* submitted a brief on behalf of *amicus curiae* Consumer Action (*Tomar, Simonoff, Adourian & O'Brien,* attorneys).

*Beverly R. Porway,* Counsel, submitted a brief on behalf of *amicus curiae* Federal Deposit Insurance Corporation.

*Charles N. Riley* submitted a brief on behalf of *amici curiae* the States of Hawaii, Iowa, Maryland, Massachusetts, Pennsylvania, South Carolina, Vermont, West Virginia, and Wisconsin (*Tomar, Simonoff, Adourian & O'Brien,* attorneys).

*Dennis R. Casale* submitted a brief on behalf of *amici curiae* The New Jersey Bankers Association, American Bankers Association, American Financial Services Association and Consumer Bankers Association (*Jamieson, Moore, Peskin & Spicer,* attorneys).

*Michael J. Dunne* submitted a brief on behalf of *amici curiae* Visa U.S.A., Inc., and Mastercard International Incorporated (*Pitney, Hardin, Kipp & Szuch,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

The facts and issues in this case are substantially similar to those in the companion case, *Sherman v. Citibank (South Dakota), N.A.,* 143 *N.J.* 35, 668 *A.2d* 1036 *rev'g* 272 *N.J.Super.* 435, 640 *A.2d* 325 (1994), also decided today. Here, New Jersey credit-card holders challenge the legality of late-payment fees assessed by Greenwood Trust, a federally-insured state bank chartered in Delaware. The bank, on the other hand, claims that it is permitted under the Depository Institutions Deregulation and Monetary Control Act to charge out-of-state customers the same interest rate and other lender-imposed charges it is authorized to charge its own customers.

The specific issues are framed by the contentions of the parties. Plaintiff is the named party in this class-action suit. As in *Sherman,* plaintiff argues that New Jersey's Retail Installment Sales Act, *N.J.S.A.* 17:16C–50, –54 (RISA) (since amended, *L.* 1995, *c.* 43) forbids federally-insured state banks that issue credit cards to New Jersey customers from charging late-payment fees, that defendant's advertising and cardmember agreements violate New Jersey's Consumer Fraud Act, *N.J.S.A.* 56:8–2, –19 (CFA), and that the imposition of late-payment fees constitutes a common-law breach of contract and conversion. Like the claims in *Sherman,* plaintiff's claims focus on whether the notion of interest includes late-payment charges.

Greenwood Trust, however, argues it is free to charge late-payment fees in New Jersey. It relies on section 521 of the Depository Institutions Deregulation and Monetary Control Act, 12 *U.S.C.A.* § 1831d (DIDA), which expressly mirrors section 85 of the National Bank Act, 12 *U.S.C.A.* § 85(NBA), and provides that federally-insured state banks may charge borrowers "interest at a rate allowed by the laws of the State . . . where the bank is located." 12 *U.S.C.A.* § 1831d(a). Section 521 expressly preempts conflicting state "constitution[s] or statute[s]." *Ibid.* Because it is a federally-insured state bank chartered in Delaware, which includes late fees in its statutory definition of interest, Greenwood Trust argues that RISA and plaintiff's other claims conflict with, and are preempted by, section 521. 272 *N.J.Super.* at 438–39, 640 *A.*2d 325.

The Law Division dismissed the complaint. The Appellate Division affirmed, 272 *N.J.Super.* 435, 640 *A.*2d 325, and we granted plaintiff's petition for certification. 138 *N.J.* 270, 649 *A.*2d 1289 (1994).

■ For substantially the same reasons expressed in *Sherman,* we conclude that this State's usury law prohibiting banks from charging late fees does not conflict with the federal statute giving national banks and federally-insured state banks preferential treatment with respect to lending authority. We hold that DIDA

does not preempt the New Jersey RISA's prohibition on late-payment fees, and, therefore, reverse the judgment of the Appellate Division.

I

Although it is clear that Congress intended section 521 to preempt conflicting state usury provisions, federal preemption of state law requires an actual conflict, not merely a potential, speculative or hypothetical one. *Rice v. Norman Williams Co.*, 458 *U.S.* 654, 659, 102 *S.Ct.* 3294, 3298–99, 73 *L.Ed.*2d 1042, 1049 (1982); *Brown v. Hotel Employees International Union*, 468 *U.S.* 491, 510, 104 *S.Ct.* 3179, 3185, 82 *L.Ed.*2d 373, 389 (1984). An actual conflict arises when it is impossible to comply with both state and federal law, or when state law is an obstacle to the accomplishment of the full purposes and objectives of Congress. *Schneidewind v. ANR Pipeline Co.*, 485 *U.S.* 293, 299–300, 108 *S.Ct.* 1145, 1150–51, 99 *L.Ed.*2d 316, 325 (1988); *Feldman v. Lederle Lab.*, 125 *N.J.* 117, 135, 592 *A.*2d 1176 (1991). However, courts faced with potentially conflicting state and federal statutes must attempt to harmonize them whenever possible. *Exxon Corp. v. Hunt*, 97 *N.J.* 526, 533, 481 *A.*2d 271 (1984) (citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 *U.S.* 132, 83 *S.Ct.* 1210, 10 *L.Ed.*2d 248 (1963); *Huron Cement Co. v. City of Detroit*, 362 *U.S.* 440, 80 *S.Ct.* 813, 4 *L.Ed.*2d 852 (1960)). "Preemption of state law by federal statute is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakenly so ordained.'" *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 *U.S.* 311, 317, 101 *S.Ct.* 1124, 1130, 67 *L.Ed.*2d 258, 264–65 (1981) (quoting *Florida Lime & Avocado Growers, Inc., supra*, 373 *U.S.* at 142, 83 *S.Ct.* at 1217, 10 *L.Ed.*2d at 257).

Section 521 of DIDA provides that any federally-insured state bank may:

notwithstanding any State constitution or statute to the contrary which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on

any loan or discount made, or upon any note, bill or exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank ... is located or at the rate allowed by the laws of the State ... where the bank is located, whichever may be the greater....

[12 *U.S.C.A.* § 1831d(a).]

The language and purpose of section 521 essentially imitate that of section 85 of the NBA. *See, e.g., Copeland v. MBNA America Bank, N.A.,* —— *Colo.* ——, ——, 907 *P.*2d 87 (1995). Courts and federal agencies have interpreted Section 521 as conferring on federally-insured state banks the same insulation from State usury laws that national banks have enjoyed for over 100 years under the NBA. *Greenwood Trust Co. v. Massachusetts,* 971 *F.*2d 818, 826–27 (1st Cir.1992) (concluding that section 521 permits federally-insured state banks to "export" interest rates), *rev'g* 776 *F.Supp.* 21 (D.Mass.1991); *VanderWeyst v. First State Bank,* 425 *N.W.*2d 803, 806 (Minn.) (concluding that section 521 gives federally-insured state banks "most-favored-lender" status), *cert. denied,* 488 *U.S.* 943, 109 *S.Ct.* 369, 102 *L.Ed.*2d 359 (1988); *Smiley v. Citibank (South Dakota), N.A.,* 11 *Cal.*4th 138, 44 *Cal.Rptr.*2d 441, 465–66, 900 *P.*2d 690 (1995) (Arabian, J., dissenting); *id.* 44 *Cal.Rptr.*2d at 467–68, 900 *P.*2d 690 (George, J., dissenting). Thus, "interest," as that term is used in the NBA and DIDA, should be construed uniformly. *E.g., Greenwood Trust, supra,* 971 *F.*2d at 827 ("historical record clearly requires a court to read the parallel provisions of DIDA and the Bank Act in *pari materia* "); *see also Morales v. Trans World Airlines, Inc.,* 504 *U.S.* 374, 384, 112 *S.Ct.* 2031, 2037, 119 *L.Ed.*2d 157, 167 (1992) (finding that when legislature borrows exact phrase from existing statute, courts should adopt prior judicial interpretations of that phrase). As demonstrated in *Sherman,* the term "interest" in the NBA does not include late fees, 143 *N.J.* at 45–60, 668 *A.*2d 1036; *Smiley, supra,* 44 *Cal.Rptr.*2d at 469, 900 *P.*2d 690 (George, J., dissenting). We conclude that "interest" in DIDA similarly does not include late fees.

Like section 85, the language in section 521 expressly refers to interest rates. It says nothing about other specific charges associated with lending money. Thus, it would be improvident to impute to Congress the intent to include in the statute a meaning it did not express. Moreover, as we discussed at length in *Sherman,* the legislative history surrounding DIDA's enactment indicates that Congress intended to preempt only state usury laws regarding traditional interest, namely, periodic percentage rates, not other specific charges. *See Sherman,* 143 *N.J.* at 49–52, 668 *A.*2d 1036; *see also Smiley, supra,* 44 *Cal.Rptr.*2d 441, 465, 900 *P.*2d 690 (Arabian, J., dissenting).

The record of Congressional debate and deliberation concerning the enactment of DIDA is generally supportive of the notion that preemption of credit-card regulation under DIDA is confined to numerical interest rates. *Ibid.* Even if the sponsors and supporters of DIDA preemption provisions were shown to be committed to achieving total competitive equality of all lending terms offered by state banks and national banks, the simultaneous and persistent concerns of the bill's sponsors to preserve state consumer protection must likewise be acknowledged. During Senate consideration of the conference report on March 27, 1980, Senator Proxmire emphasized the limited preemptive scope of Title V.[1] This limitation, in DIDA's Title V, to annual percentage rates is clear from the Senate floor discussions of mortgage loans, from the Senate Banking Committee Report, and from the hearings on DIDA in the House of Representatives.[2]

---

[1] 126 Cong.Rec. S. 6900 (March 27, 1980):

> I wish to reemphasize the point made initially in the Senate Banking Committee report that in exempting mortgage loans from State usury limitations, we intend to exempt only those limitations that are included in the annual percentage rate. We do not intend to exempt limitations on prepayment charges, attorneys' fees, late charges or similar limitations designed to protect borrowers.

[2] An official of the Federal National Mortgage Association, in response to an inquiry by Rep. St. Germaine, Chair of a House subcommittee considering DIDA, referred to the Senate Banking Committee Report cited above and stated:

## II

In this case, as in *Sherman*, the defendant relies on an agency interpretation of the statute to support its expanded notion of interest. However, to rely upon agency determinations in this case would be to undermine our responsibility to interpret the law by the views of an entity that has heretofore failed to provide a clear and consistent understanding of what Congress intended to include in its definition of interest. Far less than the usual amount of deference to an agency interpretation is appropriate when that agency has failed to adopt a consistent interpretation in administering the statute in question. *See Sherman, supra,* 143 *N.J.* at 56–58, 668 *A.*2d 1036 (citing *INS v. Cardoza–Fonseca,* 480 *U.S.* 421, 446 n. 30, 107 *S.Ct.* 1207, 1221 n. 30, 94 *L.Ed.*2d 434, 457 n. 30 (1987); *Watt v. Alaska,* 451 *U.S.* 259, 273, 101 *S.Ct.* 1673, 1681, 68 *L.Ed.*2d 80 (1981); *General Elec. Co. v. Gilbert,* 429 *U.S.* 125, 143, 97 *S.Ct.* 401, 411–12, 50 *L.Ed.*2d 343 (1976)); *see also Director, Office of Workers' Compensation Programs v. Mangifest,* 826 *F.*2d 1318, 1319–20 (3d Cir.1987) (finding "ambiguities and inconsistencies in the Director's interpretation ... of regulations ... sufficiently great to preclude deference"); *Disabled in Action v. Sykes,* 833 *F.*2d 1113, 1117–19 (3d Cir.1987), *cert. denied,* 485 *U.S.* 989, 108 *S.Ct.* 1293, 99 *L.Ed.*2d 503 (1988); *Revak v. National Mines Corp.,* 808 *F.*2d 996, 1002 (3d Cir.1986) (rejecting deference arguments due to inconsistent agency interpretation of statute). Neither the Office of the Comptroller of the Currency (OCC), which regulates national banks, nor the Federal Deposit Insurance Company (FDIC), the agency charged with the regulation of

---

This expression of legislative intent not to displace state laws designed for consumer protection with regard to charges other than charges treated as interest would leave in place those protective enactments in the various states that relate to prepayment penalties, *late charges,* regulations on disclosure of interest charges and restrictions on other costs in connection with loan transactions *other than interest.*

[*Regulation Q. and Related Measures: Hearings Before the Subcommittee on Financial Institutions of the Committee on Banking, Finance and Urban Affairs,* 96th Cong., 2d Sess. 125–26 (1980) (emphasis added).]

federally-insured banks, has issued consistent rulings concerning the interpretation of interest for purposes of the NBA and DIDA. *See Sherman, supra,* 143 *N.J.* at 58–60, 668 *A.*2d 1036. *But cf. Copeland, supra,* —— *Colo.* at ——, 907 *P.*2d 87 (asserting that "[t]he OCC *consistently* has taken the position that late payment fees are interest" under both section 85 of the NBA and section 521 of the DIDA) (emphasis added). Inconsistent agency rulings should not be guides for a judiciary, the government branch principally responsible for the construction of statutes. *See, e.g., SEC v. Sloan,* 436 *U.S.* 103, 118, 98 *S.Ct.* 1702, 1711, 56 *L.Ed.*2d 148 (1978); *Federal Maritime Comm. v. Seatrain Lines, Inc.,* 411 *U.S.* 726, 745–46, 93 *S.Ct.* 1773, 1784–85, 36 *L.Ed.*2d 620, 633–34 (1973).

## III

■ In addition, New Jersey's State Bank Parity Act, *N.J.S.A.* 17:13B–1 to –2, does not authorize banks located in this State to charge late-payment fees in the guise of interest. *Sherman,* 143 *N.J.* at 61–64, 668 *A.*2d 1036. Defendant contends, as did the defendant in *Sherman,* that because New Jersey credit unions are authorized to charge late fees to credit-card customers, *N.J.S.A.* 17:13–104b, New Jersey banks are so authorized pursuant to the State Bank Parity Act. That is simply not the case.

The State Bank Parity Act authorizes New Jersey banks to charge the same "rate of interest" charged by credit unions. *N.J.S.A.* 17:13B–2 provides, in pertinent part, that,

> any bank, savings bank, savings and loan association or credit union may charge a *rate* of interest on any class or type of loan at the rate of interest permitted to any other lender by the laws of this State on that class or type of loan.
>
> [*N.J.S.A.* 17:13B–2 (emphasis added).]

Although the Act provides for parity between the rates of interest charged by both banks and credit unions, the act does not explicitly authorize banks to charge other types of fees. Furthermore, there is no indication that the Legislature implicitly intend-

ed to authorize the imposition of such other fees in the State Bank Parity Act. *See Sherman, supra,* 143 *N.J.* at 61–64, 668 *A.*2d 1036. There are sound reasons grounded in public policy why the Legislature would choose not to equate interest charges with other imposed fees like late charges. For example, because small, individualized lenders, such as credit unions, serve their own members and do not cater to a large market, they cannot spread costs like banks. Thus, they must be permitted to take certain actions to insure their solvency, such as charging late-payment fees. *Ibid.*

We hold that Greenwood Trust has failed to demonstrate a Congressional intention to preempt state usury laws that prohibit discrete, specialized charges that do not directly affect the interest rate. Thus, there is no conflict between New Jersey's RISA statute and DIDA. Prohibiting either national banks or federally-insured state banks from charging late fees does not constitute discrimination because, at the time defendant procured those charges, New Jersey banks were likewise prohibited from assessing them. Unless Congress itself expressly provides otherwise through legislation, we find that New Jersey's RISA statute prohibits Greenwood Trust from charging New Jersey customers late fees.

We note, however, as we did in *Sherman, supra,* 143 *N.J.* at 69, 668 *A.*2d 1036, that the late-charges at issue in this case were assessed prior to the enactment of *L.* 1995, *c.* 43, which amended the RISA to specifically allow for late-payment charges on retail charge accounts. The new statute, which took effect on May 29, 1995, applies prospectively only, and therefore is inapplicable to the late-payment charges at issue here. Nevertheless, we recognize that the newly amended RISA statute authorizes holders of retail charge accounts to charge late fees to customers. Thus, it would appear that *N.J.S.A.* 17:16C–42, as amended, permits national banks and federally-insured state banks issuing credit cards to charge late-payment fees. *Sherman, supra,* 143 *N.J.* at 69–71, 668 *A.*2d 1036. The charges at issue in this case,

however, are not permissible because they were assessed prior to May 29, 1995, the date the amendment became effective.

## IV

The judgment of the Appellate Division is reversed.

POLLOCK, J., dissenting.

This appeal focuses on the question whether late-payment fees are included in the definition of "interest" in the Depository Institutions Deregulation and Monetary Control Act of 1980, 12 *U.S.C.A.* § 1831d ("DIDA"). A related issue is whether the DIDA preempts state laws prohibiting late fees. As in the companion case, *Sherman v. Citibank (South Dakota), N.A.*, 143 *N.J.* 35, 668 *A.2d* 1036 (1995), also decided today, the Law Division dismissed the complaint. The Appellate Division affirmed, 272 *N.J.Super.* 526, 640 *A.2d* 855 (1994). The majority reverses. I dissent.

–I–

The facts in this case are substantially similar to those in *Sherman.* James H. Hunter is the plaintiff in a class action challenging the legality of late fees charged to New Jersey holders of credit cards issued by Greenwood Trust, a federally-insured Delaware bank. Hunter argues that New Jersey's Retail Installment Sales Act of 1960, *N.J.S.A.* 17:16C–50, to –54 ("RISA"), forbids federally-insured state banks from charging late fees to New Jersey consumers. He also argues that Greenwood Trust's cardmember agreement violates *N.J.S.A.* 56:8–2 and –19 (which prohibit consumer fraud), and that the imposition of late fees constitutes a common-law breach of contract and conversion. Like the claims in *Sherman,* Hunter's claims depend on whether interest includes late fees.

The DIDA, like the National Bank Act (NBA), which was the subject of *Sherman,* authorizes federally-insured state banks to

charge borrowers "interest ... allowed by the laws of the State ... where the bank is located." Delaware's statutory definition of interest includes late fees: "If the agreement governing a revolving credit plan so provides, a bank may impose, as interest, a late or delinquency charge." *Del.Code Ann.* tit. 5, § 950 (1994). Thus, Greenwood Trust maintains both that the DIDA expressly authorizes charging late fees as interest and that the DIDA preempts conflicting state laws.

Hunter, however, contends that late fees are not interest under the DIDA. Specifically, he asserts that "interest" refers only to the periodic percentage rate charged on outstanding balances. He argues that his state-law claims do not conflict with the DIDA, and therefore that the DIDA does not preempt them. Alternatively, Hunter argues that the DIDA's express preemption clause preempts only his statutory, but not his common-law, claims.

–II–

This case requires us to determine the meaning of "interest ... allowed by the laws of the State ... where the bank is located," as that phrase is used in the DIDA. Ultimately, matters of statutory construction involve a determination of congressional intent. *E.g., Norfolk and Western Ry. Co. v. American Train Dispatchers Ass'n,* 499 *U.S.* 117, 128, 111 *S.Ct.* 1156, 1163, 113 *L.Ed.*2d 95, 106–07 (1991); *Roig v. Kelsey,* 135 *N.J.* 500, 515, 641 *A.*2d 248 (1994). In the DIDA, Congress did not expressly define "interest." Nor does a fair reading of the legislative history disclose the intended meaning of that term.

As discussed more fully in my dissent in *Sherman, supra,* 143 *N.J.* at 75, 668 *A.*2d 1036, the Civil War Congress enacted section 85 of the NBA to protect the newly-created national banking system from unfriendly state usury laws. Section 85 provides that any national bank

> may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidence of debt, interest at a rate allowed by the laws of the State ... where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal

reserve bank in the Federal reserve district where the bank is located, whichever may be the greater. . . .

[12 *U.S.C.A.* § 85.]

In *Tiffany v. National Bank of Missouri*, 85 *U.S.* (18 Wall.) 409, 411–13, 21 *L.Ed.* 862, 863–64 (1873), the United States Supreme Court held, pursuant to section 85, that the defendant national bank could charge its borrowers the highest interest rate authorized to any lender in that state. The Court acknowledged that the "most favored lender" doctrine might disadvantage state-chartered banks, but relied on Congress's intent to create a strong national banking system immune from hostile state legislation. *Id.* at 412–13, 21 *L.Ed.* at 863–64.

A century later, the Court determined that a national bank located in one state could charge its borrowers in other states the highest interest rate allowed to any lender in its home state. *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 *U.S.* 299, 99 *S.Ct.* 540, 58 *L.Ed.*2d 534 (1978).

In the years following *Marquette*, interest rates soared. Although national banks could charge interest at a rate tied to the federal discount rate, local usury laws constrained state banks. *See Greenwood Trust Co. v. Massachusetts*, 971 *F.*2d 818, 826 (1st Cir.1992), *cert. denied*, 506 U.S. 1052, 113 *S.Ct.* 974, 122 *L.Ed.*2d 129 (1993). Congress rectified the imbalance by enacting the DIDA. *Ibid.*

Section 521 of the DIDA ("section 521") provides that

[i]n order to prevent discrimination against any [federally-insured state bank], such State bank may . . . notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank . . . is located or at the rate allowed by the laws of the State . . . where the bank is located, whichever may be the greater. . . .

[12 *U.S.C.A.* § 1831d(a).]

The text of section 521 virtually mirrors that of section 85. Section 521 articulates Congress's intent that the purpose of the

DIDA, like that of the NBA, is to prevent discrimination against federally-insured state banks. Unsurprisingly, courts and banking regulators have interpreted section 521 as protecting federally-insured state banks from hostile state laws, just as section 85 protects national banks from those laws. *Greenwood Trust, supra*, 971 *F*.2d at 826–27 (concluding that section 521 permits federally-insured state banks to "export" interest rates); *Copeland v. MBNA America Bank, N.A.,* —— *Colo.* ——, 907 *P*.2d 87 (1995) (concluding that "language and legislative history of section 521 of the DIDA grants federally insured, state chartered banks the same interest authority as national banks"); *VanderWeyst v. First State Bank,* 425 *N.W*.2d 803, 806 (Minn.) (concluding that section 521 gives federally-insured state banks "most favored lender" status), *cert. denied,* 488 *U.S.* 943, 109 *S.Ct.* 369, 102 *L.Ed*.2d 359 (1988); Letter by Douglas H. Jones, Deputy General Counsel, FDIC No. 92–47, *Fed. Banking L.Rep.* (CCH) ¶ 81,534 at 55,730 (July 8, 1992) (most favored lender and exportation principle); Letter by Frank L. Skillern, Jr., General Counsel, FDIC No. 81–3 (February 8, 1981) (most favored lender status); Letter by Kathy A. Johnson, Attorney, FDIC No. 81–7 (March 17, 1981) (exportation principle).

I agree with the majority, *ante* at 104, that "interest," as that term is used in the NBA and the DIDA, should be construed uniformly. *E.g., Greenwood Trust, supra,* 971 *F*.2d at 827; *see also Morales v. Trans World Airlines, Inc.,* 504 *U.S.* 374, 383–84, 112 *S.Ct.* 2031, 2037, 119 *L.Ed*.2d 157, 167 (1992) (finding that when legislature borrows exact phrase from existing statute, courts should adopt prior judicial interpretations of that phrase). Substantially for the reasons set forth in my *Sherman* opinion, 143 *N.J.* 35, 668 *A*.2d 1036, I conclude that "interest" in the DIDA includes late fees.

Interpretations of the Federal Deposit Insurance Corporation (FDIC), the agency charged with the regulation of federally-insured banks, 12 *U.S.C.A.* § 1811, support that conclusion. In my dissent in *Sherman, supra,* 143 *N.J.* at 80–81, 668 *A*.2d 1036, I

noted that when Congress does not define a statutory term, courts should accept a reasonable interpretation of the term of the appropriate administrative agency. *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 *U.S.* ——, ——, 115 *S.Ct.* 810, 813, 130 *L.Ed.*2d 740, 747 (1995); *Chevron, U.S.A., Inc. v. NRDC*, 467 *U.S.* 837, 843–44, 104 *S.Ct.* 2778, 2782–83, 81 *L.Ed.*2d 694, 703–04 (1984); *Lammers v. Board of Educ.*, 134 *N.J.* 264, 274, 633 *A.*2d 526 (1993); *Metromedia, Inc. v. Director, Div. of Taxation*, 97 *N.J.* 313, 327, 478 *A.*2d 742 (1984); Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 3.3 (3d ed. 1994) (discussing *Chevron*); Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 *Duke L.J.* 511, 516–18 (same). As described in my dissent in *Sherman, supra*, 143 *N.J.* at 82–83, 668 *A.*2d 1036, the Comptroller of the Currency, which regulates national banks, has long ruled that interest could include late fees. Like the Comptroller, the FDIC has concluded that interest, for purposes of section 521, includes late fees that are authorized by a bank's home state. Letter from Douglas H. Jones, Deputy General Counsel, FDIC No. 92–47, *Fed. Banking L.Rep.* (CCH) ¶ 81,534 at 55,730 (July 8, 1992). As in *Sherman*, I find that interpretation reasonable.

–III–

Whether a federal law, such as the DIDA, preempts a state law is a matter of congressional intent. *E.g., Cipollone v. Liggett Group, Inc.*, 505 *U.S.* 504, 515–17, 112 *S.Ct.* 2608, 2617–18, 120 *L.Ed.*2d 407, 422–23 (1992). The inclusion of an express preemption clause unmistakably declares the intent of Congress to preempt conflicting state statutes. *Ibid.*

The DIDA, unlike the NBA, includes such an express preemption clause. Section 521 permits a national bank to charge interest at a rate allowed by its home state "notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section...." The word "notwithstanding" suggests that Congress intended the DIDA to preempt conflicting state statutes.

Thus, under the language of the DIDA's express preemption clause, the question is whether RISA's prohibition against late fees conflicts with section 521.

In *Sherman, supra,* 143 *N.J.* at 90, 668 *A.*2d 1036, I concluded that section 85 conflicts with state laws, such as RISA, that prohibit late fees. I likewise submit that section 521 conflicts with state laws prohibiting such fees. Under its express preemption clause, the DIDA preempts Hunter's statutory claims.

I further determined in *Sherman* that New Jersey's State Bank Parity Act authorizes banks located in this State to charge interest in the form of late-payment fees. 143 *N.J.* at 89–90, 668 *A.*2d 1036; *see* Letter by Francis P. Carr, Assistant Commissioner, Department of Banking (Oct. 14, 1994). Because I conclude that New Jersey banks may charge late fees to their New Jersey customers, I also conclude that a state law prohibiting out-of-state federally-insured state banks from charging such fees impermissibly discriminates against those institutions. *See Sherman, supra,* 143 *N.J.* at 90, 668 *A.*2d 1036. That conflict with the congressional intent to prevent discrimination against federally-insured state banks further supports my conclusion that the DIDA preempts state statutes that prohibit late fees.

–IV–

Hunter argues alternatively that even if the DIDA preempts his statutory claims, his common-law claims must survive. Specifically, he argues that the United States Supreme Court's holding in *Cipollone, supra,* 505 *U.S.* 504, 112 *S.Ct.* 2608, 120 *L.Ed.*2d 407, limits the DIDA's preemptive scope to "State constitution[s] or statute[s]." 12 *U.S.C.A.* § 1831d(a). I disagree.

The Court recently addressed a comparable issue in *Freightliner Corp. v. Myrick,* 514 *U.S.* ——, 115 *S.Ct.* 1483, 131 *L.Ed.*2d 385 (1995). In *Freightliner,* the Court clarified that *Cipollone* does not preclude implied preemption whenever Congress includes an express preemption clause in a federal statute. 514 *U.S.* at ——, 115 *S.Ct.* at 1487–88, 131 *L.Ed.*2d at 393. "At best, *Cipollone*

supports an inference that an express pre-emption clause fore-
closes implied pre-emption; it does not establish a rule." *Id.* at
——, 115 *S.Ct.* at 1488, 131 *L.Ed.*2d at 393. The Court empha-
sized that a statute's preemptive scope is a function of congres-
sional intent. *Id.* at ——, 115 *S.Ct.* at 1487, 131 *L.Ed.*2d at 393.

I believe that Congress intended that section 521 of the DIDA
should have the same preemptive effect as section 85 of the NBA.
A recent interpretive letter by the FDIC further supports that
conclusion. Letter by Douglas H. Jones, Deputy General Counsel,
FDIC No. 93–27, *Fed.Banking L.Rep.* (CCH) ¶ 81,635 at 55,838
(July 12, 1993) (concluding that Congress intended to confer upon
federally-insured banks the same protections that section 85 of the
NBA confers on national banks). I conclude that Hunter's com-
mon-law claims, like his statutory claims, conflict with the DIDA
and are preempted.

–V–

In *Sherman, supra*, 143 *N.J.* at 90–91, 668 *A.*2d 1036, I disa-
greed with the majority's conclusion that in the future, out-of-state
federally-insured state banks may charge late fees on delinquent
customers, but only up to $10. Although I agree that those banks
may charge such fees, I disagree that state law may limit the
amount so charged. As a national banking law, the DIDA takes
precedence over conflicting state law. Under the authority of the
DIDA, Greenwood Trust may impose late fees as authorized by its
home state, Delaware, without reference to another state's limita-
tion on those fees. Consequently, the RISA's limitation on late
charges must yield to the DIDA, as construed by the FDIC.

Accordingly, I respectfully dissent.

Justice GARIBALDI joins in this dissent.

O'HERN, J., dissenting.

I dissent for the reasons stated in my separate opinion in
*Sherman v. Citibank*, 143 *N.J.* 35, 668 *A.*2d 1036 also filed today.

*For affirmance*—Justices POLLOCK, O'HERN and GARIBALDI—3.

*For reversal*—Chief Justice WILENTZ, and Justices HANDLER, STEIN and COLEMAN—4.