240 N.J. Super. 62 (1990)
572 A.2d 650
DANIEL J. SAUL, PLAINTIFF-APPELLANT,
v.
MIDLANTIC NATIONAL BANK/SOUTH, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 14, 1990.
Decided April 10, 1990.
*65 Before Judges DEIGHAN and VILLANUEVA.
Daniel J. Saul, appellant, argued the cause pro se.
James H. Laskey argued the cause for respondent (Norris, McLaughlin & Marcus, attorneys).
Jamieson, Moore, Peskin & Spicer submitted a brief on behalf of amicus curiae New Jersey Bankers Association (Dennis R. Casale, of counsel and on the brief).
The opinion of the court was delivered by VILLANUEVA, J.S.C., Temporarily Assigned.
Plaintiff appeals from the denial of his motion for summary judgment which sought forfeiture of alleged usurious interest and the granting of defendant bank's motion for partial summary judgment wherein the court ruled that the New Jersey Supreme Court had unequivocally held that a retail installment sales contract is not subject to the Usury Act, N.J.S.A. 31:1-1.
Plaintiff contends that the interest the defendant charged on his $15,000 loan to purchase an automobile was usurious because *66 he ultimately paid, as a result of his prepayments, more than 16% per annum permitted by the Usury Act, N.J.S.A. 31:1-1(a), which he contends is the governing statute.
The defendant contends that (1) the plaintiff agreed to pay interest on the actuarial basis which is a proper method of calculation, specifically authorized for retail transactions of $10,000 or less, N.J.S.A. 17:16C-1 et seq.; (2) there is no statute[1] regulating interest rates of retail installment sales of automobiles where loans exceed $10,000; (3) an interest rate higher than that specified in the Usury Act, N.J.S.A. 31:1-1 et seq., is specifically authorized by Supreme Court decisions; (4) since the loan was not usurious when made, the plaintiff cannot make it so by his voluntary prepayments; and (5) in any event, the state Usury Act, N.J.S.A. 31:1-1, is preempted by federal legislation, 12 U.S.C.A. § 85, which permits a national bank to charge higher rates under the "most favored lender" doctrine.
On August 28, 1984, plaintiff, a New Jersey attorney, executed a written order form for the purchase of a Model 190 Mercedes Benz automobile from Cherry Hill Motors, Inc. ("Cherry Hill Motors"). That form was merely plaintiff's order which was not signed by the dealer. The handwritten notes on the form indicate that financing for the purchase would be obtained through Heritage Bank, N.A. ("Heritage") based on a 48-month payment schedule.
On September 5, 1984, plaintiff accepted delivery of the automobile and entered into an installment sales contract with Cherry Hill Motors. Although plaintiff originally claimed that he obtained a "loan" directly from Heritage for the purchase of the automobile (which claim he has abandoned), the contract that he signed states that it is an "installment sale contract" between plaintiff and Cherry Hill Motors.
*67 The total amount financed under plaintiff's contract was $15,000, representing the cash price of the purchased vehicle, $25,343.54, plus the motor vehicle fee, $77, less plaintiff's cash downpayment of $10,420.54. Pursuant to the terms of the contract, plaintiff agreed to repay the outstanding cash balance of the purchase price plus a finance charge based on an annual percentage rate of 14.5% over four years, resulting in a total finance charge of $4,854.24. The total payments were to be $19,854.24.
The contract permitted the plaintiff to prepay the full amount owed at any time.[2] In the event of such prepayment, the contract expressly provided that plaintiff would receive credit on any unearned finance charge "according to a commonly used calculation known as the actuarial method as if all payments were made when due."
Pursuant to the terms of the agreement, the contract was immediately assigned by Cherry Hill Motors to Heritage, and all payments were to be made directly to Heritage. Heritage was subsequently acquired by Midlantic,[3] which succeeded to Heritage's rights and obligations under the contract. Over the next three years, plaintiff made a total of 38 payments under the contract, 16 of which exceeded the required minimum monthly payment.
The "Truth in Lending" portion of the contract disclosed that plaintiff's total payments would be $19,854.24. With plaintiff's last payment, Midlantic in fact received $19,854.24  the exact amount disclosed in the Truth in Lending statement. Plaintiff was informed in the Truth in Lending statement that he would *68 be required to pay a total finance charge of $4,854.24  the exact amount of finance charges he actually paid.
Notwithstanding the express terms of the contract, plaintiff claimed that his payments should have been credited by Midlantic on a simple interest basis, and that under this method his debt was paid in full as of August 3, 1987. Midlantic, however, applied plaintiff's payments in accordance with the actuarial method provided in plaintiff's contract.[4] Plaintiff also claimed that the contract he signed was either an installment sale or installment loan contract, which are subject to the Usury Act.
Plaintiff filed suit against Midlantic essentially claiming that Midlantic improperly calculated his account and, as a result, collected finance charges in excess of the lawful rate permitted under the Usury Act, N.J.S.A. 31:1-1, and in violation of other state lending statutes. Plaintiff sought a declaration that the debt was paid in full,[5] the return of the document of title to his car, a refund of all payments made after July, 1987, or, in the alternative, the return of all finance charges imposed under the contract, as well as various statutory penalties and punitive damages.
Plaintiff moved for summary judgment upon the grounds that (1) the documents from the transaction show that it was cash sale and a loan, not an installment sale, and, since the loan was not governed by any other particular statute, it was subject to N.J.S.A. 31:1-1; and (2) even if the transaction were an "installment sale", it was not exempt from N.J.S.A. 31:1-1 in light of reinterpretations of such transactions by the Supreme Court after Steffenauer v. Mytelka & Rose, Inc., 87 N.J. Super. 506, 210 A.2d 88 (Chan.Div. 1965), aff'd 46 N.J. 299, 216 A.2d 585 (1966), in Girard Acceptance Corp. v. Wallace, 76 N.J. 434, *69 388 A.2d 582 (1978), and since the Legislature amended this statute in 1981.
Midlantic then cross-moved for summary judgment, arguing that, as a matter of law, (1) installment sales contracts in general are not subject to the general usury statute; (2) even if the transaction were to be construed as a two-party installment loan between plaintiff and Midlantic (as alleged by plaintiff), rather than as a three-party installment sale transaction between plaintiff, Midlantic and Cherry Hill Motors (as alleged by Midlantic and as eventually found by the trial court), installment loans made by banks are exempted from the general usury statute; and (3) in any event, Midlantic's finance charges to plaintiff were not usurious. The judge denied both the motion and cross-motion on the ground that there was a factual dispute as to the characterization of the transaction.
Thereafter, plaintiff moved for reconsideration of the denial of his motion for summary judgment. On reconsideration, the judge again denied plaintiff's motion for summary judgment but granted partial summary judgment to Midlantic, ruling that the New Jersey Supreme Court has held that an installment sales contract is not subject to the Usury Act, N.J.S.A. 31:1-1. Steffenauer v. Mytelka & Rose, Inc., supra.
The case proceeded to trial on the factual issues of (1) whether the transaction was an "installment sale" or, as plaintiff contended, a cash sale and a loan; and (2) whether Midlantic's accounting for plaintiff's partial prepayments was in accordance with the terms of the installment sale contract. The Court determined that the transaction was an "installment sale" and that the accounting was in accordance with the terms of the contract, and entered a judgment in favor of Midlantic. Those factual determinations have not been appealed. Since the summary judgment decision had already established that if the transaction were really an "installment sale" it would not be subject to N.J.S.A. 31:1-1, that issue was not addressed at the trial.
*70 The New Jersey Bankers Association was granted leave by this court to file an amicus curiae brief.
Plaintiff states that his appeal is limited to the following narrow legal issues:
(1) is an installment sale which is not subject to N.J.S.A. 17:16C-1 et seq. subject to N.J.S.A. 31:1-1, and if so,
(2) did the interest taken by defendant in this transaction exceed that allowed by N.J.S.A. 31:1-1?
Thus, plaintiff no longer argues that the transaction in question was a loan to plaintiff from Midlantic's predecessor, Heritage; rather, plaintiff has accepted the trial court's finding that plaintiff entered into an "installment sale" with the car dealer. The other grounds for recovery have either been abandoned or were decided adversely to plaintiff at trial and have not been appealed.

I.
It is clear from the face of the agreement which plaintiff signed, both from its title and the terms used throughout, that it is an installment sale contract. It has long been established in this state that the general usury statute does not apply to finance charges imposed on a purchaser in connection with an installment sale. Steffenauer v. Mytelka & Rose, Inc., supra.
Retail sellers are permitted to charge a "cash price" for an item and, if that item is to be paid in installments, a seller may charge a higher "time sales price" that reflects the fact that the seller is not receiving the full price immediately upon consummation of the sale. This difference between the cash price and the installment sales price is known as the "time price differential." N.J.S.A. 17:16C-1(l).
Under the "time price doctrine", the finance charge assessed in connection with a bona fide purchase and sale of goods on credit as a privilege for paying the purchase price in deferred installments does not constitute usury even though the charge, if construed as interest, would exceed the highest lawful interest rate permitted on a loan. Id. 87 N.J. Super. at 510, 210 A.2d *71 88. The reason for treating the extension of credit on a purchase and sale differently from a "loan", which is governed by the general usury statute, is that:
[t]he statute against usury is striking at and forbidding the exaction or receipt of more than a specified legal rate for the hire of money and not of anything else; and a purchaser is not like the needy borrower, a victim of a rapacious lender, since he can refrain from the purchase if he does not choose to pay the price asked by the seller. So that a sale in good faith of property, merchandise, or of an indorsement, or guaranty, or even of credit, if the seller has no other interest in the transaction, is valid and not open to the objection of usury whatever the price. [Id. 87 N.J. Super. at 511-512, 210 A.2d 88 (quoting, General Motors Acceptance Corp. v. Weinrich, 218 Mo. App. 68, 262 S.W. 425 (App.Ct. 1924)].
In Steffenauer, the plaintiff purchased equipment for use in a dry cleaning business. During negotiations the seller indicated that it could arrange financing for the purchase with the defendant finance company at an "interest" rate of 7% for four years on the balance of any unpaid purchase price. Plaintiff entered into a conditional sales contract and executed a note payable to the seller, at the defendant finance company's address, in the amount of the outstanding balance of the purchase price plus a credit service charge to be paid in 48 equal monthly installments. The form contract and note were supplied by the defendant finance company and assigned to it by the seller on the same day they were executed. Plaintiff claimed that he understood that the balance due was being financed through the defendant, that the credit service charge was described to him as "interest," and that the term "time price differential" was never used in the negotiations nor familiar to him. The court held that although the 7% finance charge was in excess of the legal rate then specified in the usury statute, the transaction, by its very nature, was not subject to the usury law under the "time price doctrine." Id. 87 N.J. Super. at 516-517, 210 A.2d 88.
The facts of this case are almost identical to those of the Steffenauer case. Since the transaction in that case was deemed to be a bona fide purchase and sale and not a loan, the *72 same result is applicable here. As the Court in Steffenauer so aptly recognized:
Every credit transaction partakes of a loan, a loan by the seller to the buyer. Therefore, it is impossible to distinguish `loan' from credit per se. Where violation of a usury statute is alleged, semantics must give way to substance; and the question must always be whether the transaction in question was the kind of transaction which it was the intention of the legislature to prevent, i.e., was the `loan' a loan within the meaning to [sic] the statute. [Id. 87 N.J. Super. at 517, 210 A.2d 88 (quoting Langille v. Central-Penn Nat. Bank of Philadelphia, 38 Del. Ch. 382, 153 A.2d 211, aff'd 156 A.2d 410 (Sup.Ct. 1959)].
Plaintiff chose to purchase a luxury automobile on a credit basis. He is not the type of person "forced by adversity to borrow and/or obtain extensions of time for payment of obligations already incurred" who the prohibition against usury is intended to protect. Ibid.

II.
Plaintiff's contention that Girard Acceptance Corp. v. Wallace, supra, stands for the proposition that an installment sale contract should be treated as a "loan" for purposes of the Usury Act is without merit.[6] Indeed, no usury statute was even at issue in that case. Rather, the Court determined only that a retail installment seller of an automobile was not permitted under the Retail Installment Sales Act (RISA) to accept collateral other than the automobile being purchased as additional security for the credit extended under the contract. Ibid. It also indicated that there was no showing that the Secondary Mortgage Loan Act was applicable. Thereafter in 1981 the Legislature reiterated this holding when it enacted a statute specifically prohibiting a retail seller or lender from taking a real property mortgage as additional security in connection with a retail sale under RISA, N.J.S.A. 17:16C-39.1.
*73 Plaintiff construes that case to mean that all installment sale contracts involve a sale and a loan and that "statutes governing both these aspects are applicable." Such a result would completely abrogate the protection given to lenders of consumer credit by the Legislature under other statutes such as the RISA, N.J.S.A. 17:16C-4. RISA effectively codifies the "time price doctrine" and authorizes those persons subject to RISA to collect finance charges in an amount agreed to between buyer and seller without regard to the ceiling imposed by the general usury statute. Plaintiff's construction would make all installment sales contracts subject to the state's general usury statute and would nullify the Legislature's enactments with respect to lawful extensions of consumer credit. The numerous statutory amendments represent an obvious intention of the Legislature to promote a free market and to exempt most credit transactions from the constraints of the usury statute, not to hinder such transactions.
The Legislature has formally recognized and codified the doctrine (see, e.g., N.J.S.A. 17:16C-1(l) and 17:16C-41). Elements of reliance upon the time price differential doctrine in the marketplace led the New Jersey Supreme Court in Sliger v. R.H. Macy & Co., Inc., 59 N.J. 465, 283 A.2d 904 (1971), to state that there was "wisdom and fairness" in leaving the issue with the Legislature, "the author of the usury laws." Id. at 469, 283 A.2d 904. In that case, the Court held that a 1 1/2% per month finance charge on a charge account was not subject to N.J.S.A. 31:1-1 et seq. since revolving credit is an example of the time price differential which has traditionally been exempted from the coverage of the usury laws. The court concluded that the responsibility to regulate the time-price differential that may be charged in consumer credit transactions "rests with the other branches of the government." Id. at 470, 283 A.2d 904.
Since Sliger v. R.H. Macy & Co., Inc., supra, was decided in 1971, there has been no legislative action that in any way suggests an intention to impose greater regulation on the time price differential that may be charged with respect to the sale *74 and purchase of a luxury automobile, such as that purchased by plaintiff. To the contrary, the purchase of motor vehicles priced in excess of $10,000 remains unregulated even under the Retail Installment Sales Act, N.J.S.A. 17:16C-1 et seq. (See N.J.S.A. 17:16C-1(a); N.J.S.A. 17:16C-40.1). Furthermore, the usury statute, N.J.S.A. 31:1-1 et seq., has been amended several times since 1971, including a 1981 amendment increasing the usury rate to 16% for loans evidenced by a written contract. P.L. 1981, c. 103 § 17. None of those amendments contains any language that would lead one reasonably to conclude that the Legislature intended to expand the statute's coverage to sales transactions. The entire thrust of most of those amendments, including the 1981 enactment, has been to relax interest rate restrictions and to narrow the scope of the statute.

III.
Both parties acknowledge that RISA is not applicable to this transaction because the cash price of the goods purchased by plaintiff exceeded the $10,000 jurisdictional amount set forth in the statute. See N.J.S.A. 17:16C-1(a). It would be illogical and directly contrary to the legislative policies under RISA, however, to subject larger installment sales transactions to the limitations of the general usury statute while imposing no such restrictions on smaller transactions involving presumably less affluent consumers.
If the amendments to the general usury statute were enacted to subject all installment sales and consumer finance transactions to its provisions, as the plaintiff suggests, the Legislature certainly would have repealed those statutes which exempt lenders of consumer credit from the general usury statute. See e.g., N.J.S.A. 17:16C-4 (RISA). However, the Legislature did not repeal RISA, and there is no basis to conclude that it intended to enact two obviously contradictory statutes.
In Sliger v. R.H. Macy & Co., Inc., supra, relied upon by plaintiff, the Supreme Court acknowledged that the time-price *75 doctrine, as enunciated in Steffenauer, "is firmly imbedded in this State." Id. 59 N.J. at 469, 283 A.2d 904. There has been no judicial or legislative pronouncement since Sliger was decided to render the time-price doctrine inapplicable to the transaction at bar. Installment sales contracts, such as the one involved here, simply are not governed by the general usury statute.
Plaintiff contends that he entered this contract with the intent to make partial prepayments so as to reduce, in an accelerated manner, the principal balance owed and thereby reduce the corresponding financing charge. In short, plaintiff interprets the contract on a simple interest basis. Under this method, plaintiff contends that any amount paid in excess of the specified monthly payment due under the contract should have been applied to reduce the then outstanding principal balance and that any unearned finance charges should have been recomputed on the basis of the new principal balance resulting from each partial prepayment, thereby reducing the amount of such charges. Plaintiff's interpretation, however, is contrary to the express terms of the agreement that he signed.
Pursuant to the terms of plaintiff's contract, he agreed to pay a precomputed finance charge of $4,854.24, calculated on the basis of 14.5% per year, plus the total amount financed of $15,000, in forty-eight equal monthly payments. The contract also sets forth the terms under which the seller or, in this case, the seller's assignee, would refund any unearned finance charge in the event plaintiff were to prepay the entire outstanding indebtedness. The contract states that, in such event, the unearned finance charge will be credited "according to a commonly used calculation known as the actuarial method as if all payments were made when due."
The actuarial method is a method of allocating payments made on a loan or other form of indebtedness to principal and interest. Pursuant to this method, a payment is applied first to the accumulated interest or finance charge on the principal *76 amount of the loan or indebtedness outstanding from the time of the last payment, and the remainder is applied to the unpaid principal balance in reduction thereof. See also N.J.S.A. 17:9A-53B.(9) (definition of "actuarial method" under the Banking Act). Under the terms of plaintiff's contract, any prepayment is allocated in accordance with the actuarial method, as defined above, "as if all payments were made when due." Taken together this means that each payment, regardless of its size, is applied first to the accumulated precomputed finance charge as set forth in the amortization schedule for the month in which payment is made, notwithstanding any accelerated reduction in principal resulting from prior prepayments. Although the remainder is applied to reduce the unpaid balance of principal, the precomputed finance charge set forth in the amortization schedule for each successive month remains the same as if no prepayments had been made, because all payments are treated as made when due.
If by reason of prepayments, the unpaid principal balance is reduced to zero prior to the expiration of the four-year payment schedule, the customer would receive credit for any remaining finance charge due in connection with payments scheduled to be made after the date on which the debt is satisfied.
The actuarial method of accounting as prescribed in the contract is a commonly-used method employed by banks and other creditors in installment-type transactions. In fact, this method of accounting for prepayments is mandated for all installment loans made pursuant to the Banking Act, N.J.S.A. 17:9A-53, et seq. and all retail installment sales contracts governed by RISA, N.J.S.A. 17:16C-1, et seq. See N.J.S.A. 17:9A-53C and 54A; N.J.S.A. 17:16C-41. Both the amortization schedule prepared on plaintiff's account and the record of his account are computer-generated based on a routine computer program designed to calculate such information under the actuarial method formula. Plaintiff does not contend that the information pertaining to this transaction was miscalculated or incorrect.
*77 To prohibit installment sales contracts with precomputed finance charges, and retroactively convert all of Midlantic's credit portfolio (and those of all other banking institutions as well) to a simple interest basis, as plaintiff insists this court must do, would create burdensome paperwork for Midlantic and other lenders. A major advantage of precomputed finance charges, to both lenders and borrowers, is that minor deviations from the prescribed payment due dates do not require recomputation of each payment's allocation between principal and interest. For example, each payment owed by plaintiff has a built-in grace period of fifteen days. A simple interest loan would have required a recomputation of the interest component of any payment that was not received precisely on the due date. In contrast, when a precomputed finance charge is used, the interest component of each payment is computed once before the debtor begins his payments. Indeed, even though some of plaintiff's payments were a few days late, he still received full credit for interest paid according to the precomputed schedule as if all payments were made when due. The finance charge which plaintiff agreed to pay was properly calculated and credited according to the actuarial method of accounting.

IV.
Notwithstanding the clear and unambiguous terms of the contract which plaintiff signed and the fact that the method of accounting prescribed therein is uniformly applied in all transactions of this type, plaintiff nontheless insists that his account should have been calculated on a simple interest basis because that is what he subjectively intended when he entered into the transaction. However, extrinsic evidence of one party's alleged contractual intent is not admissible to alter or contradict the express and unambiguous terms of a written agreement. See Buono Sales, Inc. v. Chrysler Motors Corp., 239 F. Supp. 839, 841 (D.N.J. 1965), rev'd on other grounds, 363 F.2d 43 (3 Cir.1966), cert. den., 385 U.S. 971, 87 S.Ct. 510, 17 L.Ed.2d 435 (1966).
*78 The actuarial method of accounting set forth in the contract is lawful and consistent with the public policy of this state.
Plaintiff's payments to Midlantic were calculated and credited pursuant to the actuarial method of accounting. Using that accounting method, plaintiff's finance charge was calculated at the yearly rate of 14.5%  well below the 16% usury ceiling set by the general usury statute, which he contends is applicable to installment sales like this one. However, plaintiff contends the actuarial method is illegal.
Heritage and Midlantic are authorized to make loans and purchase evidences of indebtedness, such as the installment sale contract at issue here, under the National Banking Act. 12 U.S.C.A. § 24. Plaintiff concedes that this contract is not expressly regulated by any particular New Jersey statute. Accordingly, the contract is governed by general principles of contract law pursuant to which the parties are free to adopt any reasonable terms, not otherwise contrary to public policy, upon which they could agree. See City Council of Elizabeth v. Fumero, 143 N.J. Super. 275, 284, 362 A.2d 1279 (Law Div. 1976); Terminal Const. Corp. v. Bergen, etc. Authority, 34 N.J. Super. 478, 504, 112 A.2d 762 (App.Div. 1954), modified on other grounds, 18 N.J. 294, 113 A.2d 787 (1955). The contract signed by the plaintiff provides that prepayments would be applied according to the actuarial method.
If this contract were regulated by the New Jersey statutes governing analogous transactions, Midlantic would have been required to use the actuarial method. Both the RISA, and the installment loans provisions of the Banking Act, expressly provide that, in the event of prepayment, credit for the precomputed time price differential in the case of an installment sale contract and the precomputed interest in the case of an installment loan shall be "calculated according to the actuarial refund method, as if all payments were made as scheduled." N.J.S.A. 17:16C-41; N.J.S.A. 17:9A-54. See also N.J.S.A. 17:9A-53.

*79 V.
Even if the general usury statute is applicable to the transaction at bar, as plaintiff contends, the rate charged plaintiff was not in violation of the statute. Under New Jersey law, "[i]t has long been settled that if a note or security is valid when made, no subsequent act can make it usurious." Shalit v. Investors Sav. & Loan Ass'n, 101 N.J. Super. 283, 286, 244 A.2d 151 (Law Div. 1968). See also Gouiran, Usury as an offensive and defensive tactic, 113 N.J.Lawyer 28 (1985) ("If a transaction is not usurious when entered, subsequent acts do not make it usurious").
Courts, which have passed on the issue of whether a borrower's voluntary prepayments of principal and interest may make a valid contract to lend money usurious, have uniformly answered the question in the negative. For example, in Adamson v. Lilienthal, 77 Ga. App. 392, 48 S.E.2d 579 (1948), a Georgia court held:
Where a debt, including both principal and interest, and due by installments, if paid according to the terms of the contract is free from usury, the transaction is not rendered usurious by the voluntary payment of the debt in full before some of the installments matured, although, as a result, the creditor would receive, in the aggregate, a sum amounting to more than the principal and the maximum legal rate of interest.
* * * * * * * *
As the contract was not usurious in its inception, and was not rendered usurious by the voluntary payment of the principal and interest in advance of the maturity dates, the court did not err in his judgment sustaining the general demurrers to the plaintiff's petition.
Id. 48 S.E.2d at 580 (emphasis supplied). The same result obtained in Mid-America Development Corp. v. Arkansas Savings & Loan Assoc., 257 Ark. 850, 520 S.W.2d 238 (1975), in which the court held:
We have held that if an installment contract would not be usurious if paid according to its terms, the debtor's voluntary election to prepay the debt in full does not make the transaction usurious, even though the creditor thereby receives a sum exceeding the principal and the maximum legal rate of interest.
Id. 520 S.W.2d at 239; see also Reich v. Pine Lawn Bank & Trust Co., 356 S.W.2d 545, 549 (Mo. App. 1962); Hanson v. *80 Acceptance Finance Co., Inc., 270 S.W.2d 143, 148 (Mo. App. 1954).
As the plaintiff concedes on appeal, the original contract if paid according to its terms carried a finance charge of 14.5%. Thus, the finance charge under the contract was well within the 16% ceiling imposed by the general usury statute. Since whether a contract is usurious must be determined as of the time the transaction is consummated, plaintiff's subsequent voluntary prepayments cannot render this transaction, valid when made, usurious.
The finance charge which plaintiff was obligated to pay Midlantic is not unlawful when calculated and credited pursuant to the actuarial method of accounting as provided by the contract.
Consequently, plaintiff's contract with Midlantic was valid when made, and plaintiff's subsequent voluntary prepayments did not make the contract usurious.

VI.
In any event, the 16% limitation of N.J.S.A. 31:1-1 would not apply to this transaction even if the time-price differential doctrine were inapplicable to the transaction because Midlantic National Bank, like its predecessor Heritage Bank, N.A., is a national bank. Under 12 U.S.C.A. § 85, a national bank is entitled to charge the highest interest rate allowed to lenders by the laws of the state in which the bank is located. See, e.g., Tiffany v. National Bank of Missouri, 85 U.S. 409, 21 L.Ed. 862 (1874) ("The only mode of guarding against [state discrimination] was ... to allow to national associations the rate allowed by the state to natural persons generally, and a higher rate, if state banks ... were authorized to charge a higher rate.") Id. 85 U.S. at 413. This ability to "borrow" an interest rate has come to be known as the "most favored lender" doctrine.
*81 National banks may also act as most favored lenders and adopt interests rates allowed to persons other than state banks. See, e.g., United Missouri Bank of Kansas City v. Danforth, 394 F. Supp. 774 (W.D.Mo.C.D. 1975) (national bank may "borrow" interest rates allowed to competing small loan companies). An interpretive letter of the Office of the Comptroller of the Currency ("OCC"), the primary federal regulator of national banks, specifically approves the borrowing by a national bank in Kentucky of the interest rate authorized to credit unions chartered under Kentucky law. See OCC Staff Interpretative Letter No. 336, dated April 16, 1985, reprinted at [1985-87 Tr. Binder] Fed.Banking L.Rep. [CCH] Para. 85,506.
Under New Jersey's Credit Union Act of 1984, N.J.S.A. 17:13-79 et seq., a New Jersey state-chartered credit union "[n]otwithstanding the provisions of R.S. 31:1-1 to the contrary, ... may charge, contract for, and receive interest on loans at a rate or rates agreed to by the credit union and the member." N.J.S.A. 17:13-104. Hence, national banks may also make loans at an agreed upon interest rate with its customers, irrespective of the 16% limitation contained in N.J.S.A. 31:1-1. See 12 U.S.C. § 85; United Missouri Bank of Kansas City, N.A. v. Danforth, supra; OCC Staff Interpretative Letter 336, supra. Thus, the "most favored lender" doctrine provides additional support for the trial court's decision in this case. See Dwyer v. Erie Investment Co., 138 N.J. Super. 93, 98, 350 A.2d 268 (App.Div. 1975), certif. den. 70 N.J. 142, 358 A.2d 189 (1976) ("If the judgment below is warranted for a reason other than that relied upon by the trial judge the judgment must be affirmed").
Although as a general rule an amicus curiae may not interject new issues, but must accept the issues as framed and presented by the parties, Bethlehem Tp. Bd. of Ed. v. Bethlehem Tp. Ed. Ass'n, 91 N.J. 38, 449 A.2d 1254 (1982), this does not necessarily apply to the parties. In this case the respondent bank belatedly has joined the amicus curiae with *82 this defense. That was not the case in Bethlehem Tp. Bd. of Ed., supra, where only the amicus curiae challenged PERC's findings. Id. 91 N.J. at 48, 449 A.2d 1254.
Appellate courts will decline to consider questions or issues not properly presented to the trial court when there was an opportunity to do so unless the question is one of jurisdiction or great public interest. Skripek v. Bergamo, 200 N.J. Super. 620, 629, 491 A.2d 1336 (App.Div. 1985), certif. den., 102 N.J. 303, 508 A.2d 189 (1985). Normally, defenses not raised below cannot be considered on appeal. R. 2:10-2; Nieder v. Royal Indemn. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973). "[G]eneral public importance alone will warrant a departure from that rule." Brown v. Shaw, 174 N.J. Super. 32, 39, 415 A.2d 360 (App.Div. 1980). If an appellate court on its own can interject an issue, Rochinsky v. State of N.J., Dept. of Transp., 110 N.J. 399, 415-416, 541 A.2d 1029 (1988), it may in its discretion permit a party to do so, at least to support the decision below.
The federal statute, 12 U.S.C.A. § 85, preempts state law. Federal preemption of state or local law is a well-established constitutional doctrine based upon the Constitution's supremacy clause. U.S. Const. Art. VI, cl. 2. See generally, J. Nowak, R. Rotunda & J. Young, Constitutional Law, 292-96 (2d ed. 1983).
The defenses of pre-emption and "most favored lender" are matters of public importance, which should be considered on appeal even though they were initially raised by the amicus curiae.
Affirmed.
NOTES
[1] The court notes that there is a limitation by reason of the criminal usury statute, N.J.S.A. 2C:21-19(a), because a person is guilty of criminal usury if he charges an individual an interest rate which exceeds 30% per annum.
[2] However, the contract provided that plaintiff would be subject to a prepayment penalty if he paid the loan in full within twelve months after signing the contract. Since plaintiff did not prepay the loan in full within this twelve-month time period, no prepayment penalty was charged to him.
[3] After the instant action was commenced, "Midlantic National Bank/South" was merged into "Midlantic National Bank."
[4] Plaintiff has conceded this point on appeal.
[5] After filing suit plaintiff tendered final payment to Midlantic without prejudice to his claims alleged in the complaint.
[6] The footnote in the case merely stated: "To the extent that Girard Acceptance Corp. v. Boyle [109 N.J. Super. 317, 263 A.2d 170 (1970)] ... and Public Acceptance Corp. v. Taylor [127 N.J. Super. 323, 317 A.2d 388 (1974)] ... conflict with this opinion, they are overruled." 76 N.J. at 444, 388 A.2d 582.