272 N.J. Super. 435 (1994)
640 A.2d 325
MARC SHERMAN, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFF-APPELLANT,
v.
CITIBANK (SOUTH DAKOTA), N.A., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 27, 1994.
Decided April 22, 1994.
*437 Before Judges SHEBELL, LONG and LANDAU.
*438 Michael D. Donovan of Chimicles, Burt, Jacobsen & McNew, admitted pro hac vice, argued the cause for appellant; Spector Gadon & Rosen, attorneys for appellant (Ann Miller, admitted pro hac vice, of counsel; Paul R. Rosen and Robert L. Grundlock, Jr., on both the brief and the reply brief).
Christopher R. Lipsett of Wilmer, Cutler & Pickering, admitted pro hac vice, argued the cause for respondent; Dechert Price & Rhoads, attorneys for respondent (George G. O'Brien, Matthew V. DelDuca, Robert D. Rhoad, of counsel and on the brief).
Smith, Stratton, Wise, Heher & Brennan filed a brief amicus curiae for New Jersey Bankers Association (William J. Brennan, III, of counsel and on the brief).
Jeffrey M. Keiser filed a brief amicus curiae for Bank Card Holders of America.
The opinion of the court was delivered by LONG, J.A.D.
Plaintiff, Marc Sherman, here appeals from the trial judge's dismissal of the class action he filed against defendant, Citibank (South Dakota), N.A. to invalidate the late charges defendant imposed upon him in connection with a credit card it had issued to him.

I
Defendant is a nationally chartered bank association located in Sioux Falls, South Dakota. It actively solicits New Jersey consumers to apply for and accept its Visa and Mastercard credit cards through direct mailings and multi-media advertisements.
Sometime in 1989, plaintiff received a Visa credit card which defendant had mailed to him at his New Jersey residence. At the same time, he received a Cardmember Agreement. This agreement was not included in the record. However, defendant does not dispute that it provided for a late fee to be imposed if a cardholder fails to pay the designated minimum monthly payment *439 by the late payment due date. This fee is in addition to the interest which accrues on the unpaid balance and is listed separately on a cardholder's statement. Plaintiff and defendant dispute the amount of the late charge. Plaintiff says it is a $15 flat fee; defendant says it is a $6 flat fee for accounts unpaid over fifteen days plus one-half percent per month.
Between the date plaintiff received his credit card and December 1991, he did not always pay the minimum monthly installment due on his account as stated on his monthly billing statements. As a result, his succeeding monthly billing statements reflected the imposition of at least two separate late charges. These fees are prohibited by New Jersey law.
Plaintiff filed a consumer class action against defendant on behalf of himself and all residents of New Jersey who hold credit cards issued by defendant or have done so in the past and have been charged a delinquency charge or late fee in connection with those credit cards. In it he asserted four claims: (1) violation of N.J.S.A. 56:8-2 and -19, for defendant's failure to disclose in its advertising and in its agreements with credit cardholders that New Jersey law prohibits late fee charges; (2) violation of N.J.S.A. 17:16C-50 and -54, which prohibit delinquency charges on revolving credit accounts, for defendant's collection of late fees; (3) breach of contract for assessing late fees that are not reasonably related to defendant's costs; and (4) conversion.
Defendant moved to dismiss the amended complaint. At the close of oral argument, the motion judge, Judge Fratto, dismissed plaintiff's complaint on the ground that the National Bank Act preempted New Jersey law relative to the subject of interest. An order to this effect was entered from which plaintiff filed a timely notice of appeal. On appeal, plaintiff argues that his state law claims are not preempted by section 85 of the National Bank Act because the late charges at issue are not interest. We have carefully reviewed this record in light of this contention and have concluded that there is no warrant for our intervention.

*440 II

In 1864, Congress enacted the National Bank Act (NBA) ch. 106, 13 Stat. 99 (codified, as amended, in scattered sections of the United States Code). Section 85 of the NBA states in relevant part that:
[a]ny association [national bank] may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidence of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater....
[12 U.S.C.A. § 85.]
The intent of section 85 was to protect national banks from discriminatory state banking laws. See Greenwood Trust Co. v. Massachusetts, 971 F.2d 818, 826 n. 6 (1st Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993). By permitting national banks to charge interest at the rate allowed by a state's law or at a rate tied to the local federal discount rate, Congress prevented states from favoring state-chartered banks to the detriment of national banks as to the amount of interest that could be charged on bank loans. Ibid.
Ten years after the NBA was enacted, the United States Supreme Court construed section 85 in Tiffany v. National Bank, 85 U.S. (18 Wall.) 409, 21 L.Ed. 862 (1873). There, the Court announced what became known as the "most favored lender" doctrine, under which national banks could not be placed at a competitive disadvantage with respect to any state-regulated lender. Specifically, Tiffany allowed a national bank to charge interest rates chargeable by natural persons under Missouri law. 85 U.S. at 413, 21 L.Ed. at 863-64. The "most favored lender" doctrine has subsequently been interpreted to give national banks the same interest rate privileges as any competing state institutions, including small loan companies and retail installment sellers. See, e.g., Fisher v. First Nat'l Bank, 538 F.2d 1284, 1289-90 (7th Cir.1976), cert. denied, 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 778 (1977).
*441 In 1936, the Comptroller of the Currency issued an interpretation of section 85 which administratively recognized the "most favored lender" doctrine as part of federal banking law. See Barkley Clark, The Law of Bank Deposits, Collections and Credit Cards, ¶ 11.09, at 43 (3d ed. 1990). The "most favored lender" doctrine was later formally incorporated into the Comptroller's regulations covering national banks. 12 C.F.R. § 7.7310(a) (1993).
The margins of the most favored lender doctrine were later tested in Marquette National Bank v. First of Omaha Service Corp., 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978). There, First National Bank of Omaha, a national bank chartered in Nebraska, where the allowable interest rate ranged up to eighteen percent on outstanding credit card balances, attempted to "export" that rate to Minnesota, where it had solicited BankAmericard customers and where the allowable interest rate was only twelve percent. Marquette Nat'l Bank, 439 U.S. at 302-304, 99 S.Ct. at 542-43, 58 L.Ed.2d at 538-39. Minnesota law permitted credit card issuers within its borders to charge an annual usage fee to cardholders to compensate for the relatively low rate of allowable interest. Id. at 303, 99 S.Ct. at 542, 58 L.Ed.2d at 538-39. A national bank located in Minnesota, Marquette National Bank, brought an action to enjoin First of Omaha from soliciting business in and from "exporting" interest rates to Minnesota, asserting that it was losing BankAmericard customers to First of Omaha because Minnesota's low twelve-percent interest rate compelled it to charge its cardholder-customers a ten-dollar annual fee for use of the card. Id. at 304, 99 S.Ct. at 543, 58 L.Ed.2d at 539. The Minnesota-based national bank was rebuffed by the Minnesota Supreme Court and appealed.
The United States Supreme Court determined that the case was governed by section 85, and ruled that a national bank may charge interest on any loan at the rate allowed by the state where the bank is located. Id. at 313-19, 99 S.Ct. at 547-50, 58 L.Ed.2d at 544-48. The Court unanimously held that First of Omaha could charge its Minnesota customers the interest rate *442 allowed under Nebraska law, even though that rate was greater than the rate allowed in Minnesota for a Minnesota-based national bank. Id. at 318-19, 99 S.Ct. at 550-51, 58 L.Ed.2d at 547-48. Marquette effectively permitted a national bank to "export" its home state's interest rates on credit-card accounts to other states.
The question presented here is whether the late charge imposed by Citibank is exportable interest within the meaning of Marquette and the most favored lender doctrine. A number of recent federal decisions persuasively reason that late charges are interest within the meaning of federal law. Greenwood actually presented the question of whether a state bank which was chartered in Delaware and insured by the Federal Deposit Insurance Corporation could assess its Massachusetts credit card customers the late penalties permitted by Delaware law but proscribed by Massachusetts. 971 F.2d at 821-22. The First Circuit Court of Appeals was presented with a problem similar to that at issue here because the Delaware bank was governed by section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDA), Pub.L. No. 96-221, 94 Stat. 132 (1980) (codified in scattered sections of the U.S. Code). Greenwood, supra, 971 F.2d at 822. Section 521, codified at 12 U.S.C.A. § 1831d(a), allows insured state institutions to charge interest "at a rate not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank ... is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater." As Greenwood found, DIDA essentially incorporated section 85 into the legislation governing federally-insured state banks, in order to achieve parity between state and national banks. Id. at 826-27. According to Greenwood, the principle of exportation is as firmly embedded in section 521 as in section 85. The Court concluded that, under Marquette, the Delaware bank was permitted to export late fees, which were included within Delaware's definition of interest. Id. at 829. In reaching this conclusion, Greenwood *443 construed several pre-Marquette section 85 cases as holding that interest under the federal statute could encompass late charges and similar fees. Id. at 829-30 (citing Fisher v. First Nat'l Bank, 548 F.2d 255, 258-61 (8th Cir.1977) (fee for cash advance); Panos v. Smith, 116 F.2d 445, 446-47 (6th Cir.1940) (taxes and recording fees) and Cronkleton v. Hall, 66 F.2d 384, 387 (8th Cir.) (bonus or commission paid to lender), cert. denied, 290 U.S. 685, 54 S.Ct. 121, 78 L.Ed. 590 (1933)).
Tikkanen v. Citibank, (South Dakota), N.A., 801 F. Supp. 270, 278-79 (D.Minn. 1992) engaged in an analysis which is directly applicable here. There, the District Court granted summary judgment in favor of a national bank in a suit where a group of Minnesota plaintiffs alleged that late fees were not interest under section 85 and could not be assessed by out-of-state national banks against Minnesota residents. Relying on Fisher v. First National Bank, 548 F.2d 255 (8th Cir.1977), Tikkanen rejected the argument that the term "interest" under section 85 encompasses only a periodic percentage rate of interest and reasoned that section 85 mandates that whatever usury laws apply to state-chartered lenders pertain to national banks located in the state. Id. at 276-78. If the home state of a national bank defines late fees as interest, that bank may assess such fees and, under Marquette, export them to other states. Id. at 278-79.
Tikkanen recognized that a consequence of combining a broad definition of interest with Marquette's exportation principle is that national banks may locate in states with liberal credit laws to circumvent consumer protection laws enacted in other states. Id. at 276. However, it specifically rejected the plaintiffs' suggestion that the most favored lender doctrine should only be applied to allow a national bank to borrow a state interest rate (or fee) with respect to intrastate transactions but not to allow the bank to export that rate. Id. at 277. Nothing in section 85 supports a definition of interest which varies with intrastate vs. interstate activity. Ibid.
*444 Several of the other recent decisions cited by the parties also support the trial judge's conclusion although they represent interim decisions on motions for removal by banks whose late fees were challenged or, conversely, motions by plaintiffs to remand their actions to state courts. See Goehl v. Mellon Bank, 825 F. Supp. 1239 (E.D.Pa. 1993) (plaintiff's motion to remand to state court denied); Ament v. PNC Nat'l Bank, 825 F. Supp. 1243 (W.D.Pa. 1992) (removal jurisdiction found); Hill v. Chemical Bank, 799 F. Supp. 948 (D.Minn. 1992) (adopting Greenwood-type analysis in DIDA suit and rejecting plaintiff's motion for remand to state court; removal jurisdiction found); and Nelson v. Citibank (South Dakota), N.A., 794 F. Supp. 312, 320 (D.Minn. 1992) (denying plaintiffs' motion to remand to state court after analyzing section 85 in the same manner as in Tikkanen). Cf. Copeland v. MBNA America, N.A., 820 F. Supp. 537, 540 (D.Colo. 1993) (holding that, because the meaning of interest under section 85 is not self-evident, the preemptive force of sections 85 and 86 is not so extraordinary as to convert state law challenges to late fees into claims arising under federal jurisdiction). This holding resolved only the jurisdictional question of complete preemption and did not prevent the national bank from raising preemption as a defense to the plaintiffs' substantive claims.
Plaintiff contends that the above decisions (aside from Copeland) were wrongly decided and that they diverge from the well-established principle that the meaning of interest under section 85 must be determined under federal law. He also urges that, by virtue of federal decisions prior to the enactment of the NBA, as well as the legislative history to the 1864 Act, interest cannot be construed to include late fees.
Plaintiff's position that interest must be defined by federal law is tautological to the extent that federal law incorporates state definitions of interest and/or usury. Conceding the incorporation principle, plaintiff maintains that section 85 draws the line at a state's numerical rate of interest but does not incorporate (or *445 allow a national bank to export) broad definitions of interest which may be adopted by the individual states.
While a few of the early cases decided under the NBA which plaintiff cites seem to provide abstract support for this position, each turned ultimately on the fact that some aspect of the NBA specifically supplanted the state law provision sought to be incorporated into section 85. See First Nat'l Bank v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969) (state law definition of branch must give way to NBA which provides its own definition); Evans v. National Bank, 251 U.S. 108, 40 S.Ct. 58, 64 L.Ed. 171 (1919) (a national bank is not subject to a state law prohibiting the advance receipt of interest because national banks have the express authority to discount notes) and Haseltine v. Central Nat'l Bank, 183 U.S. 132, 22 S.Ct. 50, 46 L.Ed. 118 (1901) (federal law was the exclusive remedy for usury violations by a national bank).
Because of their facts, these cases do not bolster plaintiff's argument that only the state's numerical rate of interest is incorporated into section 85. Further, the weight of authority is that section 85 incorporates all state law defining interest and usury. See Citizens' Nat'l Bank v. Donnell, 195 U.S. 369, 24 S.Ct. 49, 49 L.Ed. 238 (1904) (NBA follows state law and prohibits compounding of interest where that is prohibited by the state in which the bank is located) and Daggs v. Phoenix Nat'l Bank, 177 U.S. 549, 555, 20 S.Ct. 732, 735, 44 L.Ed. 882, 885 (1900) ("[t]he intention of the national law is to adopt the state law, and permit to national banks what the state law allows to the banks organized by it"). See also First Nat'l Bank v. Nowlin, 509 F.2d 872, 876 (8th Cir.1975) (NBA adopts a state's entire case law interpreting usury limitations; it does not merely incorporate the numerical rate).
The view that section 85 incorporates a state's entire definition of interest is also the underpinning of those pre-Marquette decisions which considered whether flat fees were interest under section 85. See Fisher v. First Nat'l Bank, supra, and Northway Lanes v. Hackley Union Nat'l Bank & Trust Co., 464 F.2d 855 (6th Cir.1972). In Northway, the court held that prepayment loan *446 charges and closing costs were interest because they were defined as such for savings and loan associations in Michigan and, under the most favored lender doctrine, Michigan national banks were allowed to include these fees under section 85. 464 F.2d at 861-63. It therefore rejected a borrower's contention that the inclusion of these fees rendered a loan usurious.
Likewise, in Fisher, the court dismissed a class action by an Iowa credit cardholder who, among other things, disputed the right of a national bank based in Nebraska to charge a flat service fee for cash advances. 548 F.2d at 256. While Fisher did not expressly state that the service fee was interest under section 85, that is the logical implication of the opinion, which affirmed the District Court ruling that the challenged loan transactions were not usurious because they would have been authorized by Nebraska law for "small loan companies." Id. at 259. Under the most favored lender doctrine, Fisher ruled that national banks in Nebraska could borrow at those small loan company rates. Id. at 261. See also Panos v. Smith, 116 F.2d 445 (6th Cir.1940) (loan by Michigan national bank was usurious because, under Michigan law, that result was dictated when the maximum rate of interest was charged and the borrower was also required to pay mortgage tax and recording fees; section 85 requires court to look to Michigan law); and American Timber & Trading Co. v. First Nat'l Bank, 690 F.2d 781, 787 n. 6 (9th Cir.1982) (commenting that NBA's purpose of fostering competitive equality might be best served by a broad reading of the adoption of state law under section 85, although it noted that issue of whether compensating balance requirement increased the effective rate of interest would be the same under federal or state law).
Thus, the 1992 credit card late fee decisions are not, as plaintiff argues, recent anomalies, but are firmly rooted in section 85 jurisprudence. Further, OCC administrative rulings, even prior to Greenwood, held that, under Marquette, Northway, Fisher, and Nowlin, the laws of the state in which a national bank is located determine whether or not it can impose late charges or *447 other fees on credit card holders in other states. See Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (Comptroller's interpretation of banking act entitled to deference; Court upheld Comptroller's approval of national bank's application to open a "non-branch" office) and Saul v. Midlantic Nat'l Bank South, 240 N.J. Super. 62, 572 A.2d 650 (App.Div.) (citing OCC letter opinion in support of its decision), certif. denied, 122 N.J. 319, 585 A.2d 338 (1990). Cf. Brambila v. Board of Review, 124 N.J. 425, 437, 591 A.2d 605 (1991) (Department of Labor interpretive letter not binding where inconsistent with Congress's objectives in enacting statute). In sum, federal case law and administrative opinions support the trial judge's decision and undercut plaintiff's position that section 85 incorporates only a state's numerical rate of interest.
Further, there is nothing in the dictionary definition of interest which necessarily excludes late fees from the scope of that term. Interest has been described as the compensation allowed by law or fixed by the parties for the use or forbearance or detention of money. Black's Law Dictionary 729 (5th ed. 1979). A late fee falls within the ambit of this definition. While interest rate, on the other hand, has been defined as the numerical percentage rate of interest, we agree with Greenwood that the phrase need not be read so restrictively when construed in its statutory and historical context. 971 F.2d at 825-26.
Plaintiff's reference to the debates of the 1864 Congress where members described the varying interest rates allowed in their respective states only demonstrates that Congress contemplated that section 85 includes such rates. It is not determinative of whether the term could also include other fees.
Similarly, the early cases plaintiff relies upon do not reflect the view that the term interest could never include late fees or that interest must accrue ratably over time. Instead, they are fact specific and discuss whether a late fee or interest charge was or was not permitted in certain circumstances. See, e.g., Loudon v. Taxing Dist., 104 U.S. 771, 774, 26 L.Ed. 923, 924 (1882) (city not *448 obligated to reimburse creditor for excessive interest he had to pay when city failed to make timely payment under contract; interest due creditor under that contract was the measure of all damages); Brown v. Hiatts, 82 U.S. (15 Wall.) 177, 21 L.Ed. 128 (1872) (holding that interest does not accrue on debt during period where, because of Civil War, mortgagee was not permitted to sue on debt; Court rejected mortgagee's attempted distinction between interest which is stipulated in contract and interest which the law allows as damages for the retention of money; the stipulation for interest did not alter the principle that suspended its running during the war); and Lloyd v. Scott, 29 U.S. (4 Pet.) 205, 7 L.Ed. 833 (1830) (where party agrees to pay a specific sum exceeding the lawful interest if he does not remit principal by a specific date, it is not usury; by a punctual payment of the principal he may avoid the payment of the sum stated, which is considered a penalty).
Moreover, other early cases support the position that late fees may be considered interest. See, e.g., Wilkinson v. Daniels, 1 Greene 179 (Iowa 1848) (holding that note with twelve percent interest could be raised to fifteen percent interest if not paid when due as the fifteen percent interest was not a penalty but a contract to pay that sum upon a contingency) and Wernwag v. Mothershead, 3 Blackf. 401 (Indiana 1834) (a flat fee becoming payable only if principal is not paid on time is interest).
Plaintiff's reliance on Merchants' Nat'l Bank v. Sevier, 14 F. 662, 667 (C.C.E.D.Ark. 1882) is not persuasive. There, the court held that a national bank could not include in a promissory note a provision making the borrower liable for attorney's fees on default. It reasoned that a national bank had the ability to make loans and discounts according to standard commercial usage, and that such custom did not authorize attorney's fees. Id. at 665. Aside from the differences between attorney's fees and late charges, Merchants' Nat'l Bank did not involve an instance where the challenged fees were permitted by state law.
*449 Similarly, the more modern decisions plaintiff cites shed no light on the definition of interest under section 85. See e.g., Lew v. Goodfellow Chrysler-Plymouth, Inc., 6 Wash. App. 226, 492 P.2d 258, 262 (1971) (holding that provision in note requiring debtor to pay, after maturity, interest at a higher rate is not sufficient to render transaction usurious; late charge is solely within the borrower's control) and In re Tastyeast, Inc., 126 F.2d 879, 881-82 (3rd Cir.1941) (while interest rate assessed if note were not paid at maturity was still under usury ceiling, it was nevertheless a penalty rather than liquidated damages and was, under bankruptcy statute, payable only if it was proportionate to damages suffered), cert. denied, sub nom. Modern Factors Co. v. Tastyeast, Inc., 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942). In any case, some decisions held that late fees are interest charges while others did not. See Gary D. Spivey, Annotation, Validity and Construction of Provision Imposing "Late Charge" or Similar Exaction for Delay in Making Periodic Payments on Note, Mortgage, or Installment Sale Contract, 63 A.L.R.3d 50 (1975) (while some courts have viewed late charges as liquidated damages and evaluated them accordingly, late charges have been more commonly construed as stipulations for interest or additional interest). Thus, non-NBA case law does not provide any clear assistance to plaintiff.
Plaintiff's remaining arguments are equally unavailing. With respect to the unlawful delegation of power issue, we agree with Tikkanen that Congress did not delegate its legislative authority but rather adopted state usury laws with respect to national banks. 801 F. Supp. at 280.
Also unpersuasive is plaintiff's related policy argument that the trial court's decision, in effect, allows South Dakota to nullify the restrictions of numerous other states. As Marquette recognized, the structure of the NBA always created the potential for impairment of a state's usury laws, because individuals were always free to visit neighboring states and receive credit at foreign interest rates. 439 U.S. at 318, 99 S.Ct. at 550, 58 L.Ed.2d at 548.
*450 Plaintiff's reliance on the non-NBA legislative history likewise fails to pass muster. S.Rep. No. 96-368, 96th Cong., 2d Sess. 19 (1980), reprinted in 1980 U.S.C.C.A.N. 236, 255. Greenwood specifically found this legislative history to relate only to home mortgage loans and not to section 521 which is the analogue to section 85. 971 F.2d at 830 n. 10.
Finally, we note that the surcharges which plaintiff argues are not included in the Federal Reserve discount rate are not comparable to the late fees here.
Affirmed.